239 So.2d 256 (1970)
Gilbert E. JOHNSON, As Tax Collector of Manatee County, Florida, et al., Appellants,
v.
PRESBYTERIAN HOMES OF the SYNOD OF FLORIDA, INC., a Non-Profit Corporation of Florida, Appellee.
CITY OF BRADENTON, a Florida Municipal Corporation, et al., Appellants,
v.
PRESBYTERIAN HOMES OF the SYNOD OF FLORIDA, INC., a Non-Profit Corporation of Florida, Appellee.
Nos. 39196, 39197.
Supreme Court of Florida.
September 16, 1970.
*257 Robert E. Knowles, Bradenton, for Hiram Strickland, Tax Assessor.
Robert J. Boylston, Bradenton, for Gilbert E. Johnson, Tax Collector and Fred O. Dickinson, Comptroller of the State of Florida.
Lloyd A. Lyday, Bradenton, for City of Bradenton.
Thomas T. Cobb, of Black, Cobb, Cole, Crotty & Sigerson, Daytona Beach, for appellee.
ADKINS, Justice.
This is a direct appeal from a final judgment of the Circuit Court in Manatee County, Florida, directly passing upon the validity of Fla. Stat. (1967) § 192.06(14), F.S.A. Fla. Const., art. V, § 4(2), F.S.A.
Confusingly, Fla. Stat. (1967) § 192.06 (14), F.S.A., has been transferred in the *258 official Florida Statutes and renumbered as Fla. Stat. (1969) § 196.191(14), F.S.A. The substantive provisions of the statutes were not changed.
The appellee, plaintiff in the trial court, filed two companion suits questioning the assessment of real property taxes for the year 1968 by Manatee County and the City of Bradenton, respectively. The suit filed against the County and the suit filed against the City were consolidated. For clarity, the appellee will be referred to as "Plaintiff" and the appellants will be referred to as "Defendants."
Plaintiff contends that the assessments by the Defendants were unlawful for the reason that the property involved was exempt from taxation under the provision of Fla. Stat. (1967) § 192.06(14), F.S.A. Defendants contend that the statute is unconstitutional as applied to the facts of this case in that it attempts to grant tax exemptions to homes for the aged owned by religious organizations and operated primarily for religious purposes.
Fla. Stat. (1967) § 192.06(14), F.S.A., contains the following:
"(a) All property, real and personal, of any bona fide home for the aged, licensed by the state board of health, owned and operated by Florida corporations not for profit, which has been and is currently exempt from the payment of taxes to the United States for the income derived from the operation of such home for the aged and used by such home for the aged for the purposes for which it was organized, and limited to providing homes and services to elderly persons, housing for nurses and other personnel of such home, medical facilities, dining facilities, laundries, parking lots, auditoriums, administrative offices, and other uses essential to the operation of such home for the aged; provided that all income of such home for the aged remaining after payment of the usual and necessary expenses of operation including the payment of liens and encumbrances upon its property, shall be used exclusively for educational, charitable or scientific purposes, including the maintenance, improvement or expansion of its facilities."
In an earlier case dealing with this same property, decided prior to the enactment of Subsection (14) of Fla. Stat. (1967) § 192.06, F.S.A., this Court held that the Plaintiff was not entitled to an exemption. Presbyterian Homes of Synod of Florida, Inc. v. City of Bradenton, 190 So.2d 771 (Fla. 1966). The only change in the applicable law since the prior decision has been the enactment of Subsection (14) and the sole basis of the exemption claimed by the Plaintiff is under this new subsection.
Just as in the prior case, the parties have commendably entered into a stipulation of facts. There is no substantial difference in the facts of the case sub judice and the facts of the prior litigation between the parties.
The directors of Plaintiff, a non-profit corporation, are annually elected by the Synod of Florida of the Presbyterian Church, the highest governing body of the Presbyterian Church in the State of Florida. The officers and directors of Plaintiff are under the control of the Synod and are answerable to it for the performance of their acts and duties.
The atmosphere of the home is religious, as religious services, under the supervision of an ordained minister, are conducted in the chapel daily except on Sunday. Various religious faiths are represented by residents in the home and, on Sunday, the residents are taken to the churches of their choice. Unquestionably, a Christian atmosphere is maintained. The spiritual needs of the residents are provided for and the residents are given "Christian care" with Bible instruction and study. The general nature of Plaintiff's business is the establishment and maintenance of homes for the aged, "primarily those affiliated with the Presbyterian Church."
Defendants rely upon Fla. Const. (1885), Declaration of Rights, § 6, F.S.A., which *259 was in effect on January 1, 1968. This section provides as follows:
"No preference shall be given by law to any church, sect or mode of worship and no money shall ever be taken from the public treasury directly or indirectly in aid of any church, sect or religious denomination or in aid of any sectarian institution." (1967 Index)
The parties stipulated that any ruling with respect to the 1968 taxes on the property shall likewise apply to the 1969 taxes. Fla. Const. (1968) did not take effect until after January 1, 1969, the date upon which the tax assessment is determined. However, there was no substantial change made by the Fla. Const. (1968), art. I, § 3, F.S.A., of which provides:
"There shall be no law respecting the establishment of religion or prohibiting or penalizing the free exercise thereof. Religious freedom shall not justify practices inconsistent with public morals, peace or safety. No revenue of the state or any political subdivision or agency thereof shall ever be taken from the public treasury directly or indirectly in aid of any church, sect, or religious denomination or in aid of any sectarian institution."
Defendants also urged that Fla. Stat. (1967) § 192.06(14), F.S.A., as applied in this case, violates the clause prohibiting the establishment of religion as contained in the First Amendment to the Constitution of the United States, the provisions of which are applicable to the states under the due process provisions of the Fourteenth Amendment to the United States Constitution. Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940).
Defendants rely upon School District of Abington Township, Pa. v. Schempp, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963), in which the Court considered the constitutionality of a statute and administrative rule requiring daily readings from the Bible and the recitation of the Lord's Prayer in public schools. Recognizing that the case cited is factually distinguishable from the question in the case sub judice, defendants urge that the reasoning of the Court is applicable. In declaring the statute and rule unconstitutional the Supreme Court reasoned that the State could not pass laws which aid one religion or prefer one religion over another; that legislation must have a secular purpose that neither advances nor inhibits religion; and that government must maintain strict neutrality, neither aiding nor opposing religion.
In Walz v. Tax Commission of City of New York, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970), Walz sought an injunction in the New York courts to prevent the Tax Commission from granting property tax exemptions to religious organizations for religious properties used solely for religious worship. A summary judgment was granted in favor of the Tax Commission. The summary judgment was affirmed by the New York Court of Appeals and by the Supreme Court of the United States. The latter Court in its opinion said:
"The Establishment and Free Exercise Clauses of the First Amendment are not the most precisely drawn portions of the Constitution. The sweep of the absolute prohibitions in the Religion Clauses may have been calculated; but the purpose was to state an objective, not to write a statute. In attempting to articulate the scope of the two Religious Clauses, the Court's opinions reflect the limitations inherent in formulating general principles on a case-by-case basis. The considerable internal inconsistency in the opinions of the Court derives from what, in retrospect, may have been too sweeping utterances on aspects of these clauses that seemed clear in relation to the particular cases but have limited meaning as general principles." (90 S.Ct. 1411)
The Court then notes the struggle to find a mutual course between the Establishment and Free Exercise Clauses, saying:
"The course of constitutional neutrality in this area cannot be an absolutely *260 straight line; rigidity could well defeat the basic purpose of these provisions, which is to insure that no religion be sponsored or favored, none commanded, and none inhibited. The general principle deducible from the First Amendment and all that has been said by the Court is this: that we will not tolerate either governmentally established religion or governmental interference with religion. Short of those expressly proscribed governmental acts there is room for play in the joints productive of a benevolent neutrality which will permit religious exercise to exist without sponsorship and without interference.
"Each value judgment under the Religion Clauses must therefore turn on whether particular acts in question are intended to establish or interfere with religious beliefs and practices or have the effect of doing so. Adherence to the policy of neutrality that derives from an accommodation of the Establishment and Free Exercise Clauses has prevented the kind of involvement that would tip the balance toward government control of churches or governmental restraint on religious practice." (90 S.Ct. 1411-1412)
The Court then pointed out that in Everson v. Board of Education, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947), it was held that the First Amendment did not prohibit New Jersey from spending tax-raised funds to pay the bus fares of parochial school pupils as a part of a general program under which it paid the fares of pupils attending public and other schools. This "aid" to schools teaching a particular religious faith was regarded as no more a violation of the Establishment Clause than providing state-paid policemen detailed to protect children at the schools from the hazards of traffic.
Then in discussing property-tax exemptions the Supreme Court of the United States in Walz, supra, said:
"The legislative purpose of the property tax exemption is neither the advancement nor the inhibition of religion; it is neither sponsorship nor hostility. New York, in common with the other States, has determined that certain entities that exist in a harmonious relationship to the community at large, and that foster its `moral or mental improvement,' should not be inhibited in their activities by property taxation or the hazard of loss of those properties for nonpayment of taxes. It has not singled out one particular church or religious group or even churches as such; rather, it has granted exemption to all houses of religious worship within a broad class of property owned by nonprofit, quasi-public corporations which include hospitals, libraries, playgrounds, scientific, professional, historical and patriotic groups. The State has an affirmative policy that considers these groups as beneficial and stabilizing influences in community life and finds this classification useful, desirable, and in the public interest. Qualification for tax exemption is not perpetual or immutable; some tax-exempt groups lose that status when their activities take them outside the classification and new entities can come into being and qualify for exemption." (90 S.Ct. 1413)
"* * *
"Granting tax exemptions to churches necessarily operates to afford an indirect economic benefit and also gives rise to some, but yet a lesser, involvement than taxing them. In analyzing either alternative the questions are whether the involvement is excessive, and whether it is a continuing one calling for official and continuing surveillance leading to an impermissible degree of entanglement. Obviously a direct money subsidy would be a relationship pregnant with involvement and, as with most governmental grant programs, could encompass sustained and detailed administrative relationships for enforcement of statutory or administrative standards, but that is not this case. The hazards of churches supporting government are hardly less in their potential than the hazards of governments *261 supporting churches; each relationship carries some involvement rather than the desired insulation and separation. We cannot ignore the instances in history when church support of government led to the kind of involvement we seek to avoid.
"The grant of a tax exemption is not sponsorship since the government does not transfer part of its revenue to churches but simply abstains from demanding that the church support the state. No one has ever suggested that tax exemption has converted libraries, art galleries, or hospitals into arms of the state or employees `on the public payroll.' There is no genuine nexus between tax exemption and establishment of religion. As Mr. Justice Holmes commented in a related context `a page of history is worth a volume of logic.' New York Trust Co. v. Eisner, 256 U.S. 345, 349, 41 S.Ct. 506, 507, 65 L.Ed. 963 (1921). The exemption creates only a minimal and remote involvement between church and state and far less than taxation of churches. It restricts the fiscal relationship between church and state, and tends to complement and reinforce the desired separation insulating each from the other." (90 S.Ct. 1414-1415)
It is apparent that Fla. Stat. (1967), § 192.06(14), F.S.A., was enacted to promote the general welfare through encouraging the establishment of homes for the aged and not to favor religion, since it is not limited to homes for the aged maintained by religious groups, but applies to any which are owned and operated in compliance with the terms of the statute by Florida corporations not for profit. Under the circumstances, any benefit received by religious denominations is merely incidental to the achievement of a public purpose.
Even if the exemption be regarded as benefiting religious organizations, it does not follow that the statute violates the First Amendment. The practice of granting tax exemptions benefiting religious sects began in the colonial period. Today, at least some tax exemption for religious groups is authorized by statutory or constitutional provisions in every state and in the District of Columbia. No case has been found holding that the granting of such exemptions is contrary to state or federal constitutional provisions prohibiting the support or establishment of religion, and, where the matter has been raised, the exemption has been upheld. See Lundberg v. County of Alameda, 46 Cal.2d 644, 298 P.2d 1 (1956) (appeal dismissed sub nom. Heisey v. County of Alameda, 325 U.S. 921, 77 S.Ct. 224, 1 L.Ed.2d 157 (1956); General Finance Corporation v. Archetto, 93 R.I. 392, 176 A.2d 73 (1961) (appeal dismissed 369 U.S. 423, 82 S.Ct. 879, 8 L.Ed.2d 6 (1961)).
A state cannot pass a law to aid one religion or all religions, but state action to promote the general welfare of society, apart from any religious considerations, is valid, even though religious interests may be indirectly benefited. If the primary purpose of the state action is to promote religion, that action is in violation of the First Amendment, but if a statute furthers both secular and religious ends, an examination of the means used is necessary to determine whether the state could reasonably have attained the secular end by means which do not further the promotion of religion. See Murray v. Comptroller of Treasury, 241 Md. 383, 216 A.2d 897 (1966) (cert. den. sub nom. Murray v. Goldstein, 385 U.S. 816, 17 L.Ed. 55, 87 S.Ct. 36).
By granting the exemption to church properties used as a home for the aged, Florida does not support all religious bodies or any of them in the sense that the state espouses their acceptance or the acceptance of any of them by its citizens. The exemption goes, not only to homes for the aged owned by religious bodies, but to any bona fide homes for the aged duly licensed, owned and operated in compliance with the terms of the statute by Florida corporations not for profit. Such a home for the aged could be owned by any organization complying with the statute, regardless of religious beliefs. There is nothing *262 to prevent organizations which do not believe in a Supreme Being from also complying with the statute. In Florida, tax exemption is by no means synonymous with approval of the purposes of the body whose property is exempt.
Fla. Stat. (1967) § 192.06(14), F.S.A., does not violate the Fla. Const. (1885), Declaration of Rights, § 6, F.S.A., and the First Amendment to the United States Constitution.
Other constitutional objections to the statute are without merit as this Court in Jasper v. Mease Manor, Inc., 208 So.2d 821 (Fla. 1968), held that the Legislature had the prerogative of defining as a charitable purpose, within the constitutional provisions relating to exemption of corporate property (Fla. Const. (1885), art. IX, § 1; art. XVI, § 16)), the operation under specified conditions and limitations of certain homes for the aged.
Defendants next contend that Fla. Stat. (1967), § 192.06(14), F.S.A., was not intended by the Legislature to apply to homes for the aged owned by churches or religious groups because Fla. Stat. (1967) § 192.06(4), F.S.A., is the only subsection relating to the exemption of property used for religious purposes and should limit the exemption. In other words, the only property of a church entitled to exemption is the actual house of public worship and the land on which it is situated, the furnishings located therein, the parsonage and the burial ground, as provided in Subsection (4). Defendants say that the statute exempting property from taxation should be strictly construed. This is true, Haines v. St. Petersburg Methodist Homes, Inc., 173 So.2d 176 (Fla.App.2d, 1965), but the rule of strict construction does not require that the narrowest possible meaning be given to words descriptive of the exemption. A fair and reasonable interpretation must be made of all laws, with due regard for the ordinary acceptation of the language employed and the object sought to be accomplished thereby. See State v. Johnston, 214 Mo. 656, 113 S.W. 1083 (1908); Cedars of Lebanon Hospital v. County of Los Angeles, 35 Cal.2d 729, 221 P.2d 31 (1950).
The secular aspect of a church-related home for the aged should not be ignored. The primary purpose of the home is the care of the aged, which is a problem of widespread governmental concern. See Jasper v. Mease Manor, Inc., supra. In any home for the aged, there is a strong likelihood that one will find religious overtones. Admittedly, one of the purposes of Bradenton Manor is religious. However, the Legislature has specified the requirements which must be met in order for the home to qualify for the tax exemption, and a religious group has complied with these requirements. To exempt all homes complying with the statute, except church-related homes, would indeed be discriminatory and inconsistent with the obvious intent and secular aims of the Legislature. The fact that the home for the aged may be owned by a religious denomination does not exclude the benefits of Fla. Stat. (1967) § 192.06(14), F.S.A.
Fla. Stat. (1967), § 192.06(14) (c), F.S.A., contains the following provisions:
"No exemption from taxation shall be granted to any corporation not for profit unless, on the basis of documents and information submitted to the tax assessor, the tax assessor determines that such corporation meets the criteria set forth in paragraph (a) and that such corporation is not being operated as a profit making venture. In determining whether a corporation is being operated as a profit making venture, the tax assessor shall consider the following factors: (Emphasis supplied)
"1. Any advances or payments directly or indirectly by way of salary, fee, loan, gift, bonus, gratuity, drawing account, commission, or otherwise (except for reimbursement of advances for reasonable out-of-pocket expenses incurred on behalf of the applicant) to any person, company or other entity *263 directly or indirectly controlled by the corporation or any officer, director, trustee, member, or stockholder of the corporation; (Emphasis supplied)
"* * *
"3. Any contractual arrangement by the corporation with any officer, director, trustee, member, or stockholder of the corporation regarding rendition of services, the provision of goods or supplies, * * * (Emphasis supplied)
"* * *
"5. The reasonableness of charges made by the corporation to its tenants for a founder's fee or admission charge and the reasonableness of the rental charge or of any charges for other services, all of which is to be considered in relationship to the value of the services provided by the corporation to its tenants."
Defendants point out that 76 of the 158 residents of Bradenton Manor are members of the Presbyterian Church. The charges made at Bradenton Manor are less than the actual cost of furnishing care and maintenance to its residents and some of the residents receive direct financial assistance in making up the difference between what these persons can afford to pay and the amount of the founder's fee and monthly charges. Defendants contend that members of Plaintiff corporation receive the benefit of living in Bradenton Manor on a less-than-cost basis and under the above-quoted provisions of Fla. Stat. (1967) § 192.06(14) (c), F.S.A., the tax assessor is required by law to construe benefits directly or indirectly made to members of a corporation in determining its entitlement to the tax exemption.
The provisions of Fla. Stat. (1967) § 192.06(14) (c), F.S.A., contain factors which the tax assessor may consider in determining whether the applicant for tax exemption is a "profit making venture."
It is fundamental that a statute should be given a reasonable interpretation. No literal interpretation should be given which leads to an unreasonable or ridiculous conclusion. State v. Sullivan, 95 Fla. 191, 116 So. 255, 261 (1928). The interpretation placed upon the statute by Defendants clearly fails to meet this fundamental test. The residents of Bradenton Manor pay a substantial founder's fee upon admission to the home. As of January 11, 1968, only eleven residents had paid no founder's fee and only seven residents had not paid full founder's fee. If financially able to do so, residents are asked to pay for their care and maintenance at the rate of from $180.00 to $200.00 per month. Operating deficits are made up by substantial contributions from the constituent churches of the Synod of Florida of the Presbyterian Church in the United States and from other benevolent sources.
It is clear from the record that Bradenton Manor does not operate at a profit. The sole issue is whether its charity, extended to all its residents, constitutes the type of distribution contemplated by the Legislature when it adopted the statute, even though 76 of the residents are members of the non-profit corporation which owns and operates the home. Organizations operating homes for the aged in the manner prescribed by Fla. Stat. (1967) § 192.06(14), F.S.A., may qualify for a tax exemption even though their own members reside therein.
The final judgment of the trial court declaring the property of Plaintiff to be exempt from all ad valorem taxation by the City of Bradenton and County of Manatee for the years 1968 and 1969 and enjoining Defendants from collecting such ad valorem taxes or from selling the land because of any alleged tax delinquency for such 1968 and 1969 taxes is
Affirmed.
ERVIN, C.J., and DREW, CARLTON and BOYD, JJ., concur.