44 So.3d 112 (2010)
COUNCIL FOR SECULAR HUMANISM, INC., Richard Hull and Elaine Hull, Appellants,
v.
Walter A. McNEIL, in his official capacity as Secretary of Corrections of Florida; Prisoners of Christ, Inc., a Florida corporation; and Lamb of God Ministries, Inc. a Florida corporation, Appellees.
No. 1D08-4713.
District Court of Appeal of Florida, First District.
April 27, 2010.
*115 Christine Davis Graves of Carlton Fields, P.A., Tallahassee, for Appellants.
Bill McCollum, Attorney General, Scott D. Makar, Solicitor General, and Timothy D. Osterhaus, Deputy Solicitor General, Tallahassee, for Appellee Secretary Walter A. McNeil.
Major B. Harding, and E. Dylan Rivers of Ausley & McMullen, P.A., Tallahassee; Eric C. Rassbach, Admitted Pro Hac Vice, The Becket Fund for Religious Liberty, Washington, D.C., for Appellees Prisoners of Christ, Inc. and Lamb of God Ministries, Inc.

Revised Opinion on Appellees' Motions for Rehearing En Banc and to Certify Question
VAN NORTWICK, J.
Walter A. McNeil, Prisoners of Christ, Inc., and Lamb of God Ministries, Inc., appellees, have moved for rehearing en banc of our previous opinion in this proceeding, Council for Secular Humanism, Inc. v. McNeil, 34 Fla. L. Weekly D2557, 2009 WL 4782384 (Fla. 1st DCA December 15, 2009), and to certify a question of great public importance. By separate order, the court denies the motion for rehearing en banc. We withdraw our prior opinion, substitute the following opinion, and certify a question.
The Council for Secular Humanism, Inc., (CSH), Richard Hull and Elaine Hull appeal a final judgment on the pleadings on their amended petition seeking to have the trial court prohibit, on state constitutional grounds, appellee Walter A. McNeil, as Secretary of the Department of Corrections, from using State funds pursuant to sections 944.473 and 944.4731, Florida Statutes (2007), to support the faith-based substance abuse transitional housing programs of appellees Prisoners of Christ, Inc. (Prisoners) and Lamb of God Ministries, Inc. (Lamb of God). Count I of the amended petition alleged that payments to these organizations constituted payments to churches, sects, religious sects, religious denominations or sectarian institutions contrary to the so-called "no-aid" provision in Article I, section 3 of the Florida Constitution.[1] Count II challenged the contracts which were entered into with these faith-based institutions under the same constitutional provision. Count III sought to bar the secretary from delegating government authority and powers to chaplains pursuant to section 944.4731(6)(a), which requires that, prior to placement of an *116 offender in a faith-based substance abuse transitional housing program, a transition assistant specialist must consult with a chaplain if an inmate requests and is approved for placement. The trial court entered a final judgment on the pleadings in favor of appellees on all counts.
As to Count I, we reverse the order under review because the trial court erred in ruling that the no-aid provision was limited to the school context and, thus, did not apply to sections 944.473 and 944.4731. As to Count II, we affirm the trial court's determination that appellants lack taxpayer standing to pursue the Count II claims because those claims did not constitute a challenge to the government's taxing and spending powers. Finally, with respect to Count III, we hold that the amended petition does not state a cause of action under Article I, section 3, based on the alleged unlawful delegation of authority to prison chaplains. Accordingly, we affirm in part, reverse in part, and remand for further proceedings.

Count I
In passing on a motion for judgment on the pleadings, "all well pleaded material allegations of the complaint and all fair inferences to be drawn therefrom must be taken as true and the inquiry is whether the plaintiff has stated a cause of action by his complaint." Martinez v. Florida Power & Light Co., 863 So.2d 1204, 1205 (Fla.2003) (quoting Reinhard v. Bliss, 85 So.2d 131, 133 (Fla.1956)). "The allegations of the defendant's answer are of no avail to him at a hearing on a defendant's motion for decree on the pleadings." Id.
As alleged in the amended petition, CSH is a nonprofit New York corporation registered to do business in Florida and is a Florida taxpayer. CSH alleges that it was formed to foster religious liberty by promoting the enforcement of the principle of separation of church and state. The Hulls are Florida taxpayers residing in Leon County and members of CSH. Prisoners and Lamb of God are both Florida nonprofit corporations which describe themselves as "ministries."
McNeil, as Secretary of the Department of Corrections, entered into contracts with Prisoners and Lamb of God under which these entities were obligated to provide faith-based substance abuse post-release transitional housing program services in return for which the ministries would be paid $20 per day per prisoner assigned to the programs. In their amended petition, appellants allege that these appellees are sectarian religious institutions which use Christian doctrine to carry out their work with participants in the substance abuse transitional programs; "that the faith-based component of the state-funded programs they provide includes teaching of Christian doctrine and attempts to encourage program participants to change their character by faith in Jesus Christ and other Christian doctrines;" that Prisoners is a member of the Coalition of Prison Evangelists; and that Lamb of God works in partnership with the Church in the Woods at Freedom Ranch, a Christian church operated by John Glenn, founder of Alpha Ministries, which appellants allege is an explicitly Christian organization. Finally, appellants allege that sections 944.473 and 944.4731 authorize the "payment of funds from the public coffers" to these "sectarian institutions" in violation of Article I, section 3.
Section 944.473(2)(a) requires inmates who meet certain criteria to "participate in substance abuse program services when such services are available." Section 944.473(2)(c) provides that "[w]hen selecting contract providers to administer substance abuse treatment programs, the department shall make every effort to *117 consider qualified faith-based service groups on an equal basis with other private organizations." Section 944.4731(3)(a) adds that "contingent upon funding, the department shall enter into contracts with multiple providers who are private organizations, including faith-based service groups, to operate substance abuse transition housing programs. . ." Section 944.4731(3)(b) requires that the department "ensure that an offender's faith orientation, or lack thereof, will not be considered in determining admission to a faith-based program and that the program does not attempt to convert an offender toward a particular faith or religious preference."
In our en banc decision in Bush v. Holmes, 886 So.2d 340 (Fla. 1st DCA 2004), this court addressed the constitutionality of the Florida Opportunity Scholarship Program (OSP) and held that the no-aid provision of Article I, section 3, which mandates that "[n]o revenue of the state . . . shall ever be taken from the public treasury directly or indirectly in aid. . . of any sectarian institution," prohibited those sectarian schools from receiving funds from the State through the OSP voucher program provided for in section 229.0537, Florida Statutes (1999). In Holmes, we explained:
The constitutional prohibition in the no-aid provision involves three elements: (1) the prohibited state action must involve the use of state tax revenues; (2) the prohibited use of state revenues is broadly defined, in that state revenues cannot be used "directly or indirectly in aid of" the prohibited beneficiaries; and (3) the prohibited beneficiaries of the use of state revenues are "any church, sect, or religious denomination" or "any sectarian institution."
886 So.2d at 352.
Upon review in Bush v. Holmes, 919 So.2d 392 (Fla.2006), the Florida Supreme Court did not reach the issue addressed by this court in Holmes. Rather, the court held that the OSP was facially unconstitutional under the provisions of Article 9, section 1(a) of the Florida Constitution. The Court neither approved nor disapproved of this court's decision in Holmes, 919 So.2d at 413. Thus, this court's majority opinion in Holmes, construing Article I, section 3, remains controlling law.
In the case under review, appellees argued below and argue on appeal that the no-aid provision and this court's decision in Holmes was limited explicitly to the school context and, thus, did not apply to the instant case. In its final judgment on the pleadings, the trial court accepted appellees' argument and ruled as follows as to Count I:
While there is little relevant precedent to guide the Court's interpretation of the no-aid provision in this context, the Court finds instructive the First District's narrow application of this same provision in Bush v. Holmes, 886 So.2d 340 (Fla. 1st DCA 2004). At issue was the no-aid provision in the context of Florida's Opportunity Scholarship Program ("OSP"). See § 1002.38, Fla. Stat. The OSP permitted public school students in substandard schools to receive state-funded vouchers to attend private schools, including sectarian schools. Id. Addressing the constitutional challenge made to the program, the First District concluded that the OSP violated the no-aid provision because sectarian schools received state funds via the vouchers. Id. at 366. However, the First District restricted its ruling to the facts before it, explicitly confining its decision to the school context. Id. at 362. (Footnote and parenthetical quote omitted).
This restrictive reading of the no-aid provision and Holmes was error. Holmes governs *118 the case under review. Thus, we reverse the final judgment on the pleadings as to Count I.
Our Holmes decision did not limit its analysis to a "schools only" context. On this point, we explained in Holmes:
The Governor and the Attorney General argue that holding the OSP [Opportunity Scholarship Program] unconstitutional will put at risk a great multitude of other programs and activities in which the state provides funds for health and social service programs that are operated by institutions affiliated with a church or religious group. Those appellants assert that these programs range from the use of church buildings as polling places during elections; to the use of institutions affiliated with religion to provide social services, such as substance abuse, transitional housing or assistance to victims of crimes; to the use of healthcare facilities owned by religious groups by Medicaid recipients.
* * *
As we discuss above, nothing in the Florida no-aid provision would create a constitutional bar to state aid to a nonprofit institution that was not itself sectarian, even if the institution is affiliated with a religious order or religious organization. Unlike the sectarian schools receiving OSP vouchers, it has been observed that the health and social service programs and activities raised in the appellants' arguments, although affiliated with a church or religion, are generally operated through non-profit organizations that are not sectarian or, at least, not pervasively sectarian institutions. . . The analysis of the application of the no-aid provision to other programs is for another time and another case involving its own unique facts.
886 So.2d at 362 (citations omitted). Further, nothing in the text of Florida's no-aid provision limits its application to the school context. As we discussed in Holmes, id. at 349-50, many state constitutions contain restrictions on state funding to religions or religious institutions, although the Florida no-aid provision is among the most restrictive. Some states limit the restriction to public funding of sectarian schools. The Alabama Constitution, for example, provides that "[n]o money raised for the support of the public schools shall be appropriated to or used for the support of any sectarian or denominational school." Ala. Const. Art. XIV, § 263; see generally Mark Edward DeForrest, An Overview and Evaluation of State Blaine Amendments: Origins, Scope, and First Amendment Concerns, 26 Harv. J.L. & Pub. Pol'y 551, 576-88 (2003). In contrast, the Florida no-aid provision broadly prohibits the use of public funds "in aid of any church, sect, or religious denomination or in aid of any sectarian institution." Fla. Const., Art. I, § 3.
In granting the judgment on the pleadings below, because the trial court ruled that the no-aid provision did not apply outside of the school context, it utilized an Establishment Clause[2] analysis to conclude that the subject program in this case and the contracts entered into pursuant to that program are not unconstitutional. The trial court found that, the language in section 944.473(2)(c), which directs DOC to consider faith-based service groups on an equal basis with other private organizations, was merely an expression of a nondiscrimination policy that would prevent the state from excluding groups based on *119 religion. Examining the contracts involved, the trial court rejected the contention of the appellants that the DOC contracts in this case mandated adherence to Christian doctrines. The trial court reasoned that these contracts require the contractors to ensure that state funds are used for the sole purpose of furthering the secular goals of criminal rehabilitation and the staff of the ministries are prevented from disparaging a client's religious beliefs or seeking to convert them to a particular religious faith. See, e.g., Freedom from Religion Foundation, Inc. v. McCallum, 324 F.3d 880 (C.A.7, 2003) (holding that taxpayer group which sought to enjoin state correctional authorities from funding halfway house that incorporated Christianity into its treatment program were not entitled to that injunction because the funding did not violate the Establishment Clause.).
The appellants' claims in Count I are based solely on the no-aid provision in Florida's constitution, not the state or federal Establishment Clauses. Thus, we do not address the trial court's Establishment Clause analysis. As this court explained in Holmes, Article I, section 3 of the Florida Constitution is not "substantively synonymous with the federal Establishment Clause." 886 So.2d at 344. While the first sentence of Article I, section 3 is consistent with the federal Establishment Clause by "generally prohibiting laws respecting the establishment of religion," the no-aid provision of Article I, section 3 imposes "further restrictions on the state's involvement with religious institutions than [imposed by] the Establishment Clause." Id. Specifically, the state may not use tax revenues to "directly or indirectly" aid "any church, sect, or religious denomination or any sectarian institution." As we noted in Holmes, 886 So.2d at 359-360, the United States Supreme Court has recognized that state constitutional provisions such as Florida's no-aid provision are "far stricter" than the Establishment Clause, Witters v. Washington Department of Services for the Blind, 474 U.S. 481, 489, 106 S.Ct. 748, 88 L.Ed.2d 846 (1986), and "draw[] a more stringent line than that drawn by the United States Constitution." Locke v. Davey, 540 U.S. 712, 722, 124 S.Ct. 1307, 158 L.Ed.2d 1 (2004).
Appellees assert that, even if Prisoners and Lamb of God are considered sectarian institutions, paying them to provide social services to inmates under the programs does not violate the no-aid provision. We agree that Florida's no-aid provision does not create a per se bar to the state providing funds to religious or faith-based institutions to furnish necessary social services. As we explained in dicta in Holmes, 886 So.2d at 362, "nothing in the Florida no-aid provision would create a constitutional bar to state aid to a non-profit institution that was not itself sectarian, even if the institution is affiliated with a religious order or religious organization." Thus, allegations that government funds are paid to a religious entity to provide social services are not sufficient, standing alone, to state a cause of action under the no-aid provision. A government program that merely purchases at market prices secular services or products from a church, synagogue, or mosque would not, by itself, violate the no-aid provision. On the other hand, simply because a sectarian organization is paid to provide social services for the state, does not remove such social services program from examination under the no-aid provision. Given the text of the no-aid provision, id. at 353-54, we conclude that the overriding purpose of the provision is to prohibit the use of state funds to promote religious or sectarian activities. Thus, to violate the no-aid provision, in addition to providing social services, the *120 government-funded program must also advance religion.[3] In determining whether such programs violate the no-aid provision, the inquiry necessarily will be case-by-case and will consider such matters as whether the government-funded program is used to promote the religion of the provider, is significantly sectarian in nature, involves religious indoctrination, requires participation in religious ritual, or encourages the preference of one religion over another.[4]
In the amended petition, the appellants allege that not only are Prisoners and Lamb of God sectarian institutions, but the programs themselves are fundamentally carried out in a sectarian manner in violation of Article I, section 3. Appellants assert that these allegations are sufficient to state a cause of action under the no-aid provision. Below, appellees did not raise the sufficiency of the allegations of the amended petition under the no-aid provision and, understandably, the issue was not addressed by the trial court. Accordingly, we decline to do so now.
Appellees urge us to find persuasive the Georgia Supreme Court's decision in Taetle v. Atlanta Independent School System, 280 Ga. 137, 625 S.E.2d 770 (2006). We do find Taetle instructive. The no-aid provision in Georgia's constitution is virtually identical to the provision in Florida's constitution.[5] The Taetle court held that, when the Atlanta school system leased classroom space from a church to create a public school kindergarten annex, it did not violate the Georgia Constitution. The Georgia Court reasoned that the Georgia no-aid provision did not bar a political subdivision of the state from "enter[ing] into an arms-length, commercial agreement with a sectarian institution to accomplish a nonsectarian purpose." Id. at 771. We find the holding in Taetle consistent with our holding here. Significantly, Taetle expressly distinguished Bennett v. City of La Grange, 153 Ga. 428, 112 S.E. 482 (1922), in which the Georgia Supreme Court had held that under the Georgia no-aid provision the City of LaGrange cannot pay a sectarian organization to "assume[] the care of the poor of that city. . . ." Id. at 486-87. As the Taetle court explained, the holding in Bennett is based on the principle that under the no-aid provision: "a political subdivision of the state cannot give money to a religious institution in such a way as to promote the sectarian handiwork of the institution." Taetle, 625 S.E.2d at 771. These Georgia decisions underscore the complexity of any no-aid *121 analysis and make evident that there is a continuum along which different cases will fall depending upon the facts and circumstances present in those cases.
Appellees also argue that, if the no-aid provision bars religious entities from participating in state contracting, it would violate the Federal Establishment and Free Exercise Clauses. We do not agree. First, as we conclude above, the no-aid provision does not constitute a per se bar to state or local government contracting with religious entities for the provision of goods and services. Second, if, based upon the facts of a particular case, a court found the program in violation of the no-aid provision, such a decision would not violate the Federal Establishment and Free Exercise Clauses. As we explained in detail in Holmes, 886 So.2d at 362-66, the United States Supreme Court has recognized that a state constitutional provision, like Florida's no-aid provision, can bar state financial aid to religious institutions without violating either the Establishment Clause or Free Exercise Clause. Locke, 540 U.S. at 725, 124 S.Ct. 1307. As the Court explained, "there are some state actions permitted by the Establishment Clause but not required by the Free Exercise Clause," id. at 719, and states are free to "draw[ ] a more stringent line than drawn by the United States Constitution...." Id. at 722.
Because our decision in this case is the first instance in which the Florida no-aid provision has been applied outside of the school context and because our decision could affect the manner in which the state contracts for social services, we certify the following question of great public importance under rule 9.330, Florida Rules of Appellate Procedure:
WHETHER THE NO-AID PROVISION IN ARTICLE I, SECTION 3 OF THE FLORIDA CONSTITUTION PROHIBITS THE STATE FROM CONTRACTING FOR THE PROVISION OF NECESSARY SOCIAL SERVICES BY RELIGIOUS OR SECTARIAN ENTITIES?

Count II
As the trial court recognized, in Rickman v. Whitehurst, 73 Fla. 152, 74 So. 205, 207 (1917), the Florida Supreme Court construed the right of citizen-taxpayers to sue the state by requiring that, when challenging government policy or actions, a taxpayer must allege a "special injury" which differs in kind and degree from that sustained by other members of the community at large. In Department of Administration v. Horne, 269 So.2d 659 (Fla. 1972), the court created an exception to the Rickman standing rule. "[W]here there is an attack upon constitutional grounds based directly upon the Legislature's taxing and spending power, there is standing to sue without the Rickman requirement of special injury." Id. at 663. To withstand dismissal on standing grounds, however, the challenge must be to legislative appropriations. Id. at 663; see Philip J. Padovano, Florida Civil Practice § 4.3 (2009 ed.) ("[T]his is a narrow exception which applies only to constitutional challenges to appropriations; a plaintiff does not have standing to challenge other actions of the government simply by establishing his or her status as a taxpayer.").
In Count II, appellants have challenged the contracts entered into between DOC and Prisoners and Lamb of God, alleging that they require these ministries to "provide a transitional program that includes a faith-based component resulting in spiritual renewal" and that "the spiritual renewal is created by inculcating faith in Jesus Christ." In Count II, appellants assert that "[t]o the extent Florida Statutes *122 sections 944.473 and 944.4731 authorize the Illegal Contracts and payment of the Illegal Contracts, those statutes should be declared unconstitutional." They ask that McNeil be enjoined from entering into the contracts.
We agree with appellees that, to the extent that Count II challenges McNeil's authority to enter into contracts and the performance of those contracts by the ministries, the trial court correctly concluded taxpayer standing is not present. For, as appellees argued below, allowing third parties to gain access to courts based upon taxpayer standing to challenge the performance of contracts and the decision of an executive agency to enter into a contract would be extraordinarily burdensome and would impermissibly allow a taxpayer to interfere with State procurement contracts. In Department of Revenue v. Markham, 396 So.2d 1120, 1122 (Fla.1981) (quoting Paul v. Blake, 376 So.2d 256, 259 (Fla. 3d DCA 1979)), the Florida Supreme Court recognized that opening the courthouse door to any taxpayer suit would allow the filing of lawsuits "by disgruntled taxpayers, who, along with much of the taxpaying public these days, are not entirely pleased with certain of the taxing and spending decisions of their elective representatives." Thus, ordinarily, "the taxpayer's remedy should be at the polls and not in the courts."
We agree with the trial court that petitioners have adequately alleged grounds for taxpayer standing in Count I to attack the constitutionality of sections 944.473 and 944.4731, since the state was using legislative appropriations allegedly to aid sectarian institutions. Such is not the case with Count II. The trial court correctly ruled that standing to raise Count II is foreclosed by Markham because Count II challenges the downstream performance of these contracts by the ministries and the Department's oversight of the contracts.

Count III
In Count III, CSH and the Hulls have alleged that section 944.4731(6)(a)[6] provides a "chaplain" with important government powers with respect to the placement of offenders in substance abuse transitional programs. They allege:
This delegation of government authority to a religious official violates Article I, Section 3 of the Florida Constitution, as it unconstitutionally substitutes the judgment of a religious authority for the decision-making of secular public officials. Moreover, any use of public funds to pay the chaplain designated in Florida Statutes § 944.4731(6) similarly violates Article I, section 3 of the Florida Constitution.
They sought "a temporary and permanent injunction preventing [McNeil] from delegating government authority and powers to the chaplain, including, but not limited to, the authority to be consulted prior to *123 the placement of any offender in faith-based substance abuse transitional housing programs."
These allegations do not state a cause of action under either the Federal Establishment Clause or Article I, section 3 of the Florida Constitution. Appellants have not alleged that the acts of these chaplains establish a religion. In addition, the state's employment of a chaplain does not violate the Establishment Clause. Marsh v. Chambers, 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983). Moreover, the mere fact that public funds are used to pay a chaplain does not establish a cause of action under Florida's no-aid provision. The individual chaplains are not a church, sect, religious denomination or sectarian institution. Further, appellants do not allege that that employment of a chaplain is "in aid of any church, sect, or religious denomination or in aid of any sectarian institution."
AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings consistent with this opinion; question certified. No further motions for rehearing will be entertained.
PADOVANO, J., and BROWNING, JR., EDWIN J., Senior Judge, concur.

On Motion for Rehearing En Banc
The motion for rehearing en banc filed by appellees on December 29, 2009, the response of the appellants thereto, and the request for a vote by a judge in regular active service on this court have been considered by all judges of the court who are in regular active service and who are not disqualified. See rule 9.331(d)(a), Fla. R.App. P. Less than a majority of those judges have voted in favor of rehearing en banc. Accordingly, the motion for rehearing en banc is denied.
WOLF, KAHN, WEBSTER, BENTON, VAN NORTWICK, PADOVANO and CLARK, JJ., concur. LEWIS and WETHERELL, JJ., dissent. THOMAS, J., dissents with opinion with which HAWKES, C.J., and ROBERTS, ROWE and MARSTILLER, JJ., concur.
THOMAS, J., dissenting.
I respectfully dissent from this court's decision to deny rehearing en banc, pursuant to Florida Rule of Appellate Procedure 9.331. This is undeniably a case of exceptional importance, and we should rehear this case en banc, and recede from our prior incorrect decision in Bush v. Holmes, 886 So.2d 340 (Fla. 1st DCA 2004) (en banc), aff'd on other grounds, 919 So.2d 392 (Fla.2006). That decision is controlling in this case, absent en banc review. The panel's opinion here will apply Holmes for the first time beyond the context of school vouchers, thus potentially jeopardizing a wide range of governmental social welfare programs, including faith-based placement programs for foster children, faith-based prison programs, and other State contracts with faith-based providers, as Judge Polston predicted in his dissenting opinion in Holmes. Id. at 376. This impact will occur despite statutory protections that prohibit a program provider from attempting to convert the program's beneficiaries. See § 944.4731, Fla. Stat.
The majority decision in Holmes erroneously interpreted the plain text of article I, section three of the Florida Constitution by holding that the "no-aid" provision is violated whenever a religious provider of State services receives State revenues, regardless of the public benefit received in exchange for the revenues. Holmes did not rely on a single Florida precedent in reaching this conclusion. See Nohrr v. Brevard County Educ. Facilities Auth., 247 So.2d 304 (Fla.1971); Southside Estates Baptist Church v. Bd. of Trustees, *124 115 So.2d 697 (Fla. 1959); Koerner v. Borck, 100 So.2d 398 (Fla.1958).
Under Florida Supreme Court precedent and the plain language of the Florida Constitution, the appropriate inquiry in a "no-aid" challenge is whether the "quantum of benefit" received by the religious institution reaches the threshold definition of aid. See Southside Estates Baptist Church, 115 So.2d at 700. Judge Wolf's concurring and dissenting opinion in Holmes correctly followed this test. Holmes, 886 So.2d at 371 (stating that the correct inquiry in any "no-aid" challenge is simply whether "a specific expenditure actually involves aid to a sectarian institution or merely involves an acceptable method of providing necessary services."). The Florida Supreme Court also followed this test in City of Boca Raton v. Gidman, 440 So.2d 1277 (Fla.1983), in interpreting a similar provision in a municipal charter.
Although the doctrine of stare decisis is the preferred course for courts to follow, this court should recede from the majority opinion in Holmes. See generally Citizens United v. Fed. Election Comm'n, ___ U.S. ___, ___, 130 S.Ct. 876, 919, ___ L.Ed.2d ___, ___ (2010) (Roberts, C.J., concurring) ("stare decisis is neither an `inexorable command,' nor `a mechanical formula of adherence to the latest decision,' especially in constitutional cases.") (citations omitted). There are no "reliance interests" at stake in preserving our decision in Holmes. See generally Citizens United, 130 S.Ct. at 919, 130 S.Ct. 876 (citing Payne v. Tennessee, 501 U.S. 808, 828, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), and the proposition that under the doctrine of stare decisis, compelling interests may necessitate the preservation of prior precedent, as in contract and property cases).
We should grant Appellee's Motion for Rehearing En Banc, recede from Holmes, adopt Judge Wolf's concurring and dissenting opinion in Holmes, and hold that a No-Aid violation occurs only where a governmental contract fails to include a legitimate quid pro quo.

Analysis
The issue before this court in Holmes was whether Florida's Opportunity Scholarship Program violated the "no-aid" provision in article I, section three of the Florida Constitution, which provides:
No revenue of the state or any political subdivision or agency thereof shall ever be taken from the public treasury directly or indirectly in aid of any church, sect, or religious denomination or in aid of any sectarian institution.
(Emphasis added.) The majority opinion in Holmes divided the "no-aid" provision into three elements: "(1) the prohibited state action must involve the use of state tax revenues; (2) the prohibited use of state revenues is broadly defined, in that state revenues cannot be used `directly or indirectly in aid of' the prohibited beneficiaries; and (3) the prohibited beneficiaries of the use of state revenues are `any church, sect, or religious denomination' or `any sectarian institution.'" 886 So.2d at 352. This test was fundamentally flawed, because the constitution does not prohibit "indirect" aid, but it does prohibit the use of "direct or indirect" revenue "in aid" of religion.
While Florida's constitution prohibits the use of direct or indirect revenue to aid a sectarian institution, it does not distinguish between direct and indirect aid. What is not prohibited by the plain text of the constitution and under Florida Supreme Court precedent is the use of state revenues to contract with faith-based institutions to obtain services that provide a public benefit. Johnson v. Presbyterian Homes of Synod of Fla., Inc., 239 So.2d 256 (Fla.1970); Nohrr, 247 So.2d at 306-07.
*125 In Holmes, however, this court adopted the trial court's circular definition of aid:
While there is no evidence or assertion that any of the schools would cease to operate without the benefit of the [voucher] funds, that is not the test. It cannot be logically, legally, or persuasively argued that the receipt of these funds does not aid or assist the institution in a meaningful way. The entire educational mission of these schools, including the religious education component, is advanced and enhanced by the additional, financial support received through operation of the Opportunity Scholarship Program.
886 So.2d at 353 (emphasis added). This reasoning incorrectly equated aid to include the receipt of any funds from the State, regardless of the value of the legitimate service or goods provided in exchange for the funds. This was the entire discussion of the term "aid," other than the statement that "Appellants do not take specific issue with this finding either, although appellants suggest that any benefit received is de minimus or is incidental...." Id. at 346. Scrutiny of the language in the constitutional provision reveals that the trial court's reasoning was clearly flawed; thus, this court should not have relied upon it.
The majority's opinion in Holmes overlooked the definition of aid when determining whether the voucher program constituted aid. "Aid" is defined as
1) a subsidy granted to the King by the English Parliament until the 18th century... 2) a: the act of helping b: help given ... tangible means of assistance... 3) a: an assisting person or group... b: something by which assistance is given ... 4) a tribute paid by a vassal to his lord...."
Webster's Ninth New Collegiate Dictionary 66 (1983).
When compared with the definition of "pay," it becomes clear that the contracts under scrutiny in this case do not qualify as aid, as Appellees asserted below:
[T]he Contracts cannot be considered as "aid" within any usual or ordinary meaning of that word.... The Contracts are bilateral agreements that speak in terms of the "mutual benefits" to be exchanged between parties.... Any funds paid under the Contracts would clearly be "pay," not "aid." Compare Webster's Dictionary (1828) ("aid" means "help; succor, support, assistance"), and Webster's II New College Dictionary 24 (2005) (to "aid" is "to give help or assistance to"), with Webster's Dictionary (1828) ("pay" means "[t]o discharge a debt"), and Webster's II New College Dictionary 827 (2005) (defining "pay" as "to give money to in return for goods or services rendered").
(Citations omitted.)
The incorrect holding of Holmes will continue to adversely affect important governmental social welfare programs, despite Florida Supreme Court precedent that a State action which incidentally benefits religion does not violate article I, section three of the constitution. In Presbyterian Homes, 239 So.2d at 256, the plaintiff asserted that a statute which granted a tax exemption to elder care homes operated by a religious entity violated the predecessor to article I, section three. Although Presbyterian Homes does not discuss the "no-aid" sentence specifically, and instead addresses the Establishment Clause, the court's analysis is relevant to the question of whether the State's action aids a religious entity. Id. The Florida Supreme Court made it clear that section 192.06(14), Florida Statutes (1967), was enacted to promote general welfare by encouraging the establishment of homes for the aged, and not to favor religion because it was not *126 limited to homes maintained by religious groups. Id. 239 So.2d at 261. The court further determined that any benefit received by religious denominations was merely incidental to the achievement of a public purpose. Id. "A state cannot pass a law to aid one religion or all religions, but state action to promote the general welfare of society, apart from any religious considerations, is valid, even though religious interests may be indirectly benefited. If the primary purpose of the state action is to promote religion, that action is in violation of the First Amendment...." Id. (emphasis added).
Holmes is also inconsistent with other Florida Supreme Court decisions interpreting the "no-aid" provision. Nohrr, 247 So.2d at 306-07; Southside Estates Baptist Church, 115 So.2d at 698-700. In these decisions, the Florida Supreme Court held that the government's involvement with faith-based entities did not violate the federal establishment clause or the State's "no-aid" provision. In Nohrr, the court held that the State's higher education bonds could issue to aid religious schools and secular schools without offending the establishment clause or article I, section three. 247 So.2d at 306-07. In Southside Estates Baptist Church, the court rejected the church's claim that the school board violated the State's predecessor "no-aid" provision by allowing other churches to utilize empty school buildings on Sundays for religious services. Interestingly, the court noted that the church's challenge argued that "regardless of how small the amount of money might be, ... if anything of value can be traced from the public agency to the religious group, the Constitution has been thereby violated." 115 So.2d at 698-99. The court properly rejected this argument, stating that an "incidental benefit to a religious group resulting from an appropriate use of public property is not violative of Section 6, of the Declaration of Rights of the Florida Constitution." Id. at 700.

Conclusion
This court should rehear this case en banc, recede from our incorrect decision in Holmes, and remand this case to the lower court to allow Appellants an opportunity to attempt to amend their complaint and state a claim under the text of article I, section three of the Florida Constitution, as interpreted by the Florida Supreme Court in its well-established precedent interpreting the "no-aid" clause.
NOTES
[1] Article I, section 3 of the Florida Constitution provides:

Religious freedom.  There shall be no law respecting the establishment of religion or prohibiting or penalizing the free exercise thereof. Religious freedom shall not justify practices inconsistent with public morals, peace or safety. No revenue of the state or any political subdivision or agency thereof shall ever be taken from the public treasury directly or indirectly in aid of any church, sect, or religious denomination or in aid of any sectarian institution.
[2] The Establishment Clause of the First Amendment to the United States Constitution provides that "Congress shall make no law respecting an establishment of religion. . . ." The first sentence of Article I, section 3 of the Florida Constitution, supra n. 1, is similar.
[3] In Holmes, we were not required to address the issue of whether the voucher funds advanced religion because it was undisputed in Holmes that the voucher funds were paid to religious schools in which the tenets of the particular religion were taught. Holmes, 886 So.2d at 354.
[4] We note that, "[t]he teaching of moral values, and creating a comprehensive rehabilitation program intentionally focused on moral values and character development, need not imply indoctrination into a religious faith." Ams. United for Separation of Church and State v. Prison Fellowship Ministries, 432 F.Supp.2d 862, 875, n. 12 (S.D.Iowa 2006), affirmed in part, rev'd in part, 509 F.3d 406 (8th Cir.2007). Further, as asserted by appellees, the services received by the state under the programs certainly may serve legitimate penological goals. The question raised in the instant case is not whether the programs at issue serve a public purpose, but whether they violate the no-aid provision. As we observed in Holmes, "courts do not have the authority to ignore the clear language of the Constitution, even for a popular program with a worthy purpose." Holmes, 886 So.2d at 366-67.
[5] Article I, § 11, Par. VII of the 1983 Georgia Constitution provides:

No money shall ever be taken from the public treasury, directly or indirectly, in aid of any church, sect, cult, or religious denomination or of any sectarian institution.
[6] Section 944.4731(6)(a) provides:

(a) The transition assistance specialist and the chaplain shall provide a list of contracted private providers, including faith-based providers, to the offender and facilitate the application process. The transition assistance specialist shall inform the offender of program availability and assess the offender's need and suitability for substance abuse transition housing assistance. If an offender is approved for placement, the specialist shall assist the offender and coordinate the release of the offender with the selected program. If an offender requests and is approved for placement in a contracted faith-based substance abuse transition housing program, the specialist must consult with the chaplain prior to such placement. A right to substance abuse program services is not stated, intended, or otherwise implied by this section.