SHEPHERD, J.
This appeal arises out of a dispute between Nine Island Avenue Condominium Association (Association) and unit owners of boat slips (slip owners) at Nine Island over who is responsible for the cost of reconstruction of the marina and boat slips, destroyed by Hurricane Irene in 1999. After the hurricane, the Association assessed each slip owner a proportionate share of the $701,050 reconstruction. Some of the appellant slip owners paid the *288 special assessment and others refused. In 2002, eighteen slip owners, about half the total number, filed a declaratory action asking the trial court to exonerate them from the obligation of the special assessment on the ground the Association failed to place and keep the marina and docks insured. The Association countered with foreclosure counterclaims against those slip owners who had not paid the special assessment. The dispute spawned other disagreements between the parties, all of which revolve around which party is responsible for the costs and expenses related to the marina. After an evidentiary final hearing, the trial court concluded the slip owners solely were responsible for the costs pertaining to the marina, and we affirm.[1] However intuitively obvious our decision might appear, a sojourn through the not-so-intuitively-obvious interstices of the Florida Condominium Act and the Declaration of Condominium, to which these parties are contractually bound, is necessaiy to explain our decision.
There is no serious dispute over the material facts of this case. In 1982, two years after Nine Island Condominium was constructed, the developer built a marina, including thirty-six docks, behind the condominium building and sold the right to use the dock spaces to thirty-six of the unit owners. The dock slips are limited common elements. The Declaration of Condominium allows the “owner” of a dock space to sell or transfer his right of use of his assigned space, but only to another unit owner.[2] Hurricane force winds from Hurricane Irene destroyed the marina in mid-October of 1999. The property manager at the time testified that a preliminary study of the marina, completed by a local structural engineering firm just before Hurricane Irene, concluded the marina had outlasted its useful life. On June 2, 2000, the property manager advised the slip owners of this finding.
The slip owners’ central contention on this appeal is that the Association left them high and dry in 1999 by not insuring the marina property prior to the storm. The slip owners argue that both the Florida Condominium Act and the Declaration of Condominium required the Association to do so.
Article XI of the Declaration of Condominium delineates the Association’s responsibilities relating to insurance. It reads in relevant part:
XI. Insurance
Insurance shall be carried and kept in force at all times in accordance with the following provisions:
A. Duty and Authority to Obtain. The Association shall obtain and keep in force at all times the insurance coverage which it is required hereby *289 to carry as well as all coverage which it is required by the Condominium Act to carry....
B. Required Coverage. The Association shall purchase and carry insurance coverage as follows:
1. Casualty Insurance. Casualty insurance covering the Building and other improvements of the Condominium, including, without limitation, Units (including the bathroom and kitchen fixtures initially installed into Units by the Developer) and Common Elements, in an amount equal to the maximum insurance replacement value thereof (subject to reasonable deductible clauses), exclusive of excavation and foundation costs, as determined annually by the Board of Directors of the Association; such insurance to afford protection against:
(a) Loss or damage by fire or other hazards covered by the standard extended coverage or other perils endorsement; and
(b) Such other risks of a similar or dissimilar nature as are or shall be customarily covered with respect to buildings and other improvements similar in construction, location and use, to the Building and other improvements of the Condominium, including, without limitation, vandalism, malicious mischief, windstorm, water damage and war risk insurance, if available; ... [3]
The slip owners argue the language of this Article, requiring the Association to “purchase and carry ... [c]asualty insurance covering the Building and other improvements of the Condominium, including, without limitation, Units (including the bathroom and kitchen fixtures initially installed into Units by the Developer) and Common Elements ... exclusive of excavation and foundation,” is “clear and unambiguous with regard to what coverage the Association is required to ‘purchase and carry,’ ” namely that the Association must secure windstorm coverage on the marina and dock spaces as well as the Building and Common Elements.[4] We agree with the slip owners that the insurance article is clear and unambiguous. However, we find, as did the trial court, that under the de novo standard of review we are authorized to exercise when interpreting an unambiguous contract on an appeal from a final judgment, see First Equitable Realty III, Ltd. v. Grandview Palace Condo. Ass’n, 46 So.3d 1088, 1090 (Fla. 3d DCA 2010), the insurance article in the Declaration does not require the Association to purchase and maintain insurance coverage on the docks. We reach this conclusion for several reasons.
First, the plain language of the insurance provision requires the Association to purchase insurance only on the Building and other improvements of the Condominium, including the Units and Common Elements. The word “Building” is a defined word in the Declaration, meaning “the [twenty-five]-story high rise building constituting the principal improvement locat *290 ed on the land.” The reference in this provision to “Units” and “Common Elements” is clearly a reference to the land-based elements of the “Condominium Property” — itself a more inclusive, defined term found in the definitional provisions of the Declaration.[5] Article III of the Declaration, entitled “Description of the Condominium Property,” includes separate paragraphs delimiting and distinguishing the “Common Elements” of the Condominium Property from the “Limited Common Elements.” The boat slips are expressly stated to be “Limited Common Elements” under Article III, section E.6 of the Declaration. If “Limited Common Elements” were to be included in the “Required Coverage” section of Article XI of the Declaration, it would have been a simple matter for the drafters to have included the phrase “Limited Common Elements” after the term “Common Elements.” The drafters did not do so. Furthermore, that the sole focus (and purpose) of.the “Required Coverage” section of Article XI of the Declaration is to require the Association to purchase and carry casualty insurance on the land-based elements of the Condominium Property — the Building, the Units, and the Common Elements — is fully and finally demonstrated by the fact the drafters carefully excluded one land-based element, “excavation and foundation costs,” from the Association’s insurance procurement obligations. We believe the “Required Coverage” section of the insurance article in this Declaration is reasonably susceptible to only one interpretation, that the Association was not required by the terms of the Declaration to purchase and carry a policy of windstorm insurance on the marina and boat docks. See Smith v. Shelton, 970 So.2d 450, 451 (Fla. 4th DCA 2007).
The slip owners argue, in the alternative, that the Association also failed to “use its best efforts to obtain and maintain adequate insurance to protect the association, association property, the common elements, and the condominium property required to be insured by the association,” as required under section 718.111, Florida Statutes (1999). Even assuming the marina and dock slips are encompassed within this statutory mandate — a dubious proposition based upon the reasoning and logic previously enunciated — the slip owners provided no evidence at the final hearing that the Association failed to seek out insurance on the marina, or even that windstorm insurance was available for purchase in the marketplace in 1999. In fact, the only evidence on the subject was from Richard Gold-stein, a member of the Association Board of Directors in 1995 and again from 2002 to 2007, as well as a member of the budget committee from 1993 to the time of trial. Goldstein testified the Association insured the marina until 1994, when its insurer, Travelers Insurance Company, non-renewed the Association policy, and the only available insurer, a “state sponsored” insurer of last resort, advised the Association there was “no way of getting insurance on [the marina] because of its age.” According to Goldstein, it was not until 2002, after the marina was rebuilt, that insurance on the marina once again was available. The trial court properly found for the Association on this alternative claim.
*291 On all other issues raised by the slip owners — including whether allocated costs can be charged to them pursuant to the Declaration’s requirement that the slip owners “shall be responsible for maintaining, repairing, replacing and keeping in orderly condition said marina and boat docks,” alleged budgeting improprieties by the Association, the slip owner’s request for a set off, and the statute of limitations and recoupment issues — we adopt the well-reasoned opinion of the trial court and, accordingly, affirm all final judgments under review.
Affirmed.

. The unit owners originally sought our intervention in this decade-old controversy (the National Weather Service already has re-circulated the storm name "Irene”) three years ago, but that appeal was dismissed for lack of jurisdiction. See Belle Isle Assocs., Inc. v. Nine Island Ave. Ass’n, 990 So.2d 1176 (Fla. 3d DCA 2008).

. We use the term “own” or slip "owner” in the context of a dock slip in a colloquial sense in this opinion in an effort to make the opinion “easy sailing” for the reader. Under Article I'll, section E.6 of the Declaration, a dock slip "owner” only holds the "right to use” a dock space. This section states:
Any designation or assignment of a boat dock or space will grant only an exclusive right of use to the boat dock or space as a Limited Common Element appurtenant to the Unit to which it is assigned. An assignment will not convey any title to the underlying real property or to the docking facilities.
Notably, the Association makes no claim that it holds title to the submerged land under the boat docks.

. We proceed under the assumption that the phrase "if available” relates back only to "war risk” insurance.

. It is noteworthy that not only do the slip owners contend the Association must obtain windstorm insurance for the benefit of the slip owners, but also that the cost of the insurance — whatever it may be, and without any limitation — is an Association expense, meaning it must be spread across all of the condominium unit owners, 274 in number, rather than the thirty-six dock and marina users. The condominium documents do not support this assertion.

. Article II, section L of the Declaration defines the term “Condominium Property” as “the land and personal property that are subjected to condominium ownership under this Declaration, all improvements on said land, and all easements and rights appurtenant thereto for use in connection with the Condominium.” The definition of the word "Building” appears in Article II, section D.