HANZMAN, MICHAEL, Associate Judge.
Appellant, Citizens Property Insurance Corporation (“Citizens”), appeals the trial court’s final judgment confirming an appraisal award. Citizens claims that the final judgment improperly awarded the ap-pellee damages for: (a) property excluded under its policies, and (b) amounts that should have been deducted from the award by application of defenses the trial court refused to consider. We agree in part and reverse.

Facts and Procedural History

The material facts are not in dispute. Appellee, River Manor Condominium Association, Inc. (“River Manor”), operates a residential condominium complex consisting of three buildings — A, B and C — each of which were separately insured by Citizens at the time of Hurricane Wilma. When the parties were unable to agree on the extent of the damage caused by the storm, they participated in a mandatory appraisal process, resulting in an award which specified the total loss sustained by each building and the exterior common *848 elements, as follows: Building A ($1,755,703.50); Building B ($1,839,556.45); Building C ($1,589,157.29); Exterior Common Elements ($1,253,278.84). The appraisers were not charged with the task of deciding — nor did they purport to decide— any coverage issues. Their sole responsibility was to ascertain the amount of damage caused by the insured peril. See Fla. Ins. Guar. Ass’n, Inc. v. Olympus Ass’n, Inc., 34 So.3d 791, 794 (Fla. 4th DCA 2010).
The policies issued by Citizens each exclude from coverage “other structures on the demised locations, set apart from the building by clear space,” including such things as carports, cabanas, swimming pools, Jacuzzis, piers, seawalls, bridges, ramps, walks, decks, patios and similar structures. Also excluded from coverage are trees, shrubs, plants and other landscaping. The parties do not dispute that the appraisal award in the amount of $1,253,278.84 for “exterior common elements” represents compensation for damage caused to such excluded items. If this case turned on a simple application of the controlling insurance contracts it would therefore end here. See, e.g., Graber v. Clarendon Nat’l Ins. Co., 819 So.2d 840, 842 (Fla. 4th DCA 2002) (“Interpretation of insurance policy language is a matter of law....”); Sherman v. Transamerica Life Ins. Co., 475 F.App’x 733, 736 (11th Cir.2012) (“ ‘Florida’s public policy is that contracts, including insurance contracts, must be enforced as written.’ ” (citation omitted)).
This case, however, is not so simple because (a) each policy contains a provision requiring that it be amended to “conform” to any conflicting statutes of. the State where the property is located; and (b) River Manor claims that Citizens’ exclusions “conflict” with section 718.111(11), Florida Statutes (2005), because that statute — and in particular subsection (ll)(b)— requires insurers that issue condominium policies to provide coverage for “[a]ll portions of the condominium property located outside the units,” and “[a]ll portions of the condominium property for which the declaration of condominium requires coverage by the association.” § 718.111(ll)(b), Fla. Stat. (2005). Based upon this supposed “conflict,” River Manor says the policies must be “amended” to delete the exclusions pursuant to the conformance clauses which provide that:
Any terms of this policy which are in conflict with the statutes of the State wherein the property is located are amended to conform to such statutes ....
There is no doubt that River Man- or’s properties are located in Florida, and the exclusions are “terms” that the conformance clauses would require be amended if in “conflict” with the statutes of this State. The only question is whether the exclusions in fact conflict with section 718.111(ll)(b).[1] Finding that section *849 718.111(11)(b) in fact imposes a mandatory insurance obligation on carriers, and that a “conflict” therefore existed between Citizens’ policy “exclusions” and the statute, the trial court granted summary judgment — and thereafter entered final judgment — awarding the amounts the appraisal attributed to the otherwise excluded items. We review that decision de novo as it raises a matter of statutory interpretation. Heart of Adoptions, Inc. v. J.A., 963 So.2d 189, 194 (Fla.2007).
Citizens also claims that certain items contained in the appraisal awards should not have been included in the trial court’s judgment because: (a) River Manor agreed to remove them from the awards; (b) the items were duplicates of other amounts awarded; or (c) the items, such as interior doors, baseboards, light fixtures, and other property within the par-ametrical boundaries of the units, were the unit owners’ responsibility. The trial court refused to address these issues, accepting River Manor’s contention that doing so would require it to improperly consider extrinsic evidence and look beyond the face of the appraisal award. It therefore granted River Manor’s motion for summary judgment on these issues, and eventually entered a final judgment for the amounts assessed in the appraisal, less the amounts previously paid. Our review of an order granting summary judgment is also de novo. See DeLeon v. Dollar Tree Stores, Inc., 98 So.3d 96, 97 (Fla. 4th DCA 2012).

Citizens’ Policy Exclusions Do Not Conflict With Section 718.111(ll)(b), Florida Statutes (2005)

In matters of statutory construction it is fundamental that “legislative intent is the polestar by which the court must be guided-” State v. Webb, 398 So.2d 820, 824 (Fla.1981); see also Princeton Homes, Inc. v. Morgan, 38 So.3d 207, 210-11 (Fla. 4th DCA 2010). To ascertain that intent courts consider a variety of factors “including the language used, the subject matter, the purpose designed to be accomplished, and all other relevant and proper matters.” Badaraco v. Suncoast Towers v. Assocs., 676 So.2d 502, 503 (Fla. 3d DCA 1996) (citing Am. Bakeries Co. v. Haines City, 131 Fla. 790, 180 So. 524, 532 (1938)); see also Bautista v. State, 863 So.2d 1180, 1185 (Fla.2003) (“ ‘To discern legislative intent, courts must consider the statute as a whole, including the evil to be corrected, the language, title, and history of its enactment, and the state of law already in existence on the statute.’ ” (citation omitted)).
It is of course true that a “statute must be given its plain and obvious meaning.” Holly v. Auld, 450 So.2d 217, 219 (Fla.1984) (quoting A.R. Douglass, Inc. v. McRainey, 102 Fla. 1141, 137 So. 157, 159 (1931)). If the “language of the statute is clear and unambiguous and conveys a clear and definite meaning,.there is no occasion for resorting to the rules of statutory interpretation and construction.... ” Id. (quoting A.R. Douglass, 137 So. at 159); see also Kingsway Amigo Ins. Co. v. Ocean Health, Inc., 63 So.3d 63, 66 (Fla. 4th DCA 2011) (same). That does not, however, mean that parts — or in this case sub-parts — of a statute should be read in isolation. Rather, “[ejvery statute must be read as a whole with meaning ascribed to every portion and due regard given to the semantic and contextual interrelationship between its parts.” Forsythe v. Longboat Key Beach Erosion Control Dist., 604 *850 So.2d 452, 455 (Fla.1992) (quoting Fleischman v. Dep’t of Prof'l Regulation, 441 So.2d 1121, 1123 (Fla. 3d DCA 1983)). The principle that a statute must be read “in the context of its surrounding sections[,]” BellSouth Telecomm., Inc. v. Meeks, 863 So.2d 287, 290 (Fla.2003), applies with equal force in instances where a part of the statute standing alone may appear to be clear and unambiguous:
[I]f a part of a statute appears to have a clear meaning if considered alone but when given that meaning is inconsistent with other parts of the same statute or others in pari materia, the Court will examine the entire act and those in pari materia in order to ascertain the overall legislative intent.
Florida Dep’t of Envtl. Prot. v. Contract-Point Fla. Parks, LLC, 986 So.2d 1260, 1265-66 (Fla.2008) (citing Fla. State Racing Comm’n v. McLaughlin, 102 So.2d 574, 575-76 (Fla.1958) (emphasis added)). In other words, it is our duty to examine a statute as a “cohesive whole,” Palm Beach Cnty. Canvassing Bd. v. Harris, 772 So.2d 1273, 1287 (Fla.2000), so as “ ‘to give effect to every clause in it, and to accord meaning and harmony to all of its parts.’” Jones v. ETS of New Orleans, Inc., 793 So.2d 912, 914-15 (Fla.2001) (quoting Acosta v. Richter, 671 So.2d 149, 153-54 (Fla.1996)).
Finally, “a literal interpretation of the language of a statute need not be given when to do so would lead to an unreasonable or ridiculous conclusion.” Holly, 450 So.2d at 219 (citing Johnson v. Presbyterian Homes of Synod of Fla., Inc., 239 So.2d 256 (Fla.1970)); see also Vrchota Corp. v. Kelly, 42 So.3d 319, 322 (Fla. 4th DCA 2010) (“The legislature is not presumed to enact statutes that provide for absurd results.”); Badaraco, 676 So.2d at 503 (“Where focusing on literal statutory language leads to absurd or unreasonable conclusions ... a court will look beyond the ordinary meaning of the statutory language.”) (citing Weber v. Dobbins, 616 So.2d 956 (Fla.1993)).
Mindful of these principles we now turn to an examination of section 718.111(ll)(b), Florida Statutes (2005), in order to ascertain whether, as River Manor contends, it creates mandatory insurance coverage which conflicts with Citizens’ exclusions. Before reviewing the precise language of the particular subsection at issue, we first observe that section 718.111 is contained within Chapter 718, aptly titled the “Condominium Act,” the purpose of which is to give statutory recognition to the condominium form of ownership of real property and establish procedures for the creation, sale and operation of condominiums. See § 718.102, Fla. Stat. (2005). As its title suggests, the “Condominium Act” regulates condominiums — not insurance companies.
Furthermore, section 718.111 is titled “The association,” and each of its subsections regulate the activities of thát “Corporate entity.” See § 718.111(1), Fla. Stat. (2005). The statute, for example, establishes how the association shall be constituted, see § 718.111(l)(a)-(c); the powers and duties of the association, see § 718.111(2)-(14), including the association’s rights to own and convey property, see § 718.111(7)(a); and the association’s right to purchase land, leases, and condominium units. See § 718.111(8)-(9). The subject matter of this statute is clearly the regulation of condominium associations, as its title suggests.
The fact that section 718.111 is contained within the “Condominium Act”— which regulates only condominiums — and that section 718.111 is aimed squarely at condominium “associations,” suggests that the objective of subsection 11 is not to further regulate the business of insur- *851 anee — an industry extensively regulated elsewhere — but rather to impose certain insurance-related obligations on the association and its board.[2] The statute, read as a “cohesive whole,” reflects a purpose of governing condominium associations, not insurers. See Harris, 772 So.2d at 1287.
This contextual interpretation is reinforced by a textual examination of the particular subsection at issue. Subsection (ll)(a) of section 718.111 requires that a unit-owner controlled association, such as River Manor, use its “best efforts to obtain and maintain adequate insurance to protect the association, the association property, the common elements, and the condominium •property required to be insured by the association pursuant to paragraph (b).” (emphasis supplied). Subsection (ll)(b) then describes the “property required to be insured by the association”:
Every hazard insurance policy issued or renewed on or after January 1, 2004, to protect the condominium shall provide primary coverage for:
1. All portions of the condominium property located outside the units;
2. The condominium property located inside the units as such property was initially installed, or replacements thereof of like kind and quality and in accordance with the original plans and specifications or, if the original plans and specifications are not available, as they existed at the time the unit was initially conveyed; and
3. All portions of the condominium property for which the declaration of condominium requires coverage by the association.
§ 718.111(ll)(b), Fla. Stat. (2005).
This delineation of required coverage is “intended to establish the property or casualty insuring responsibilities of the association and those of the individual unit owner_” § 718.111(ll)(b)3., Fla. Stat. (2005). A reading of subsections (ll)(a) and (ll)(b), in pari materia, therefore suggests that the purpose of subsection (ll)(b) is to identify what types of insurance the association (as opposed to the unit owners) is responsible for obtaining, with paragraph (a) defining what efforts (i.e., best efforts) the association must make to secure it. And if, as River Manor urges, subsection (ll)(b) imposed an absolute obligation on insurers to provide the coverage, subsection (ll)(a) would be meaningless, as the association would not have to use any effort — let alone its “best efforts” — to obtain it. The association, in violation of its statutory obligation, could in fact expend “no effort” and secure the coverage by legislative fiat any time an insurer elected to issue a policy.
A literal reading of subsection (ll)(b) in isolation also requires us to conclude that the legislature intended to force private parties — i.e., condominium associations and their insurers — to enter into a commercial transaction that one or both may not desire. If the carrier is unwilling to provide all the coverage specified under subsection (ll)(b), its only option would be not to issue any policy at all. The same result would occur even where the association sought to purchase the policy the insurer was willing to issue, that is, a policy that did not offer all the coverage required *852 under subsection (ll)(b). And if a carrier is willing to provide all the specified coverage, the association has a concomitant obligation to pay for that policy even if it might be desirable and prudent to self-insure some of its property. Instead of using its business judgment to negotiate a contract that fits its needs, the association would be required to purchase insurance that could be prohibitively expensive, or swallowed by incredibly high deductibles.
Thus, two potential — and likely consequences — of a literal interpretation of subsection (ll)(b) will be that insurers will issue no policies at all, thereby denying condominium associations much needed coverage, or condominium associations will be forced to pay excessive rates for coverage they do not want or need. Such undesirable “[cjonsequences cannot alter statutes, but may help to fix their meaning.” In re Rouss, 221 N.Y. 81, 116 N.E. 782, 785 (1917) (Cardozo, J). And the consequence of the literal interpretation urged by River Manor is an unreasonable result.[3]
Without wading into the academic question of when, and under what circumstances, the legislature may constitutionally use its police powers to require that private parties engage in a particular type of business, we also doubt it would exercise such weighty authority as cavalierly as suggested here, via: (a) a statute which does not regulate the business being mandated; and (b) the use of a single sub-paragraph which imposes no parameters or guidance on the terms of the compelled transaction. We suspect that in exercising its police powers to dictate state-imposed commerce, the legislature would carefully craft a set of laws to be applied in carrying out its mandate, as it has in other insurance contexts. See, e.g., § 627.736, Fla. Stat. (2005) et. seq. It would not simply command the issuance of a policy with specific coverage requirements, and leave it to the parties to work out the material terms.
The total absence of any related provisions addressing the parameters of the transaction supposedly being compelled strongly suggests that the statute was not intended to hoist contractual terms on unwilling participants or eliminate the power of condominium associations to negotiate their own insurance contracts, a power all other property owners possess. In our view the statute was intended to impose upon condominium associations an obligation to use their “best efforts” to secure the designated coverage, implicitly recognizing that market forces may in some instances prevent this objective from being achieved. See, e.g., Roberts v. Nine Island Ave. Condo. Ass’n, Inc., 126 So.3d 286, No. 3D09-371, 2011 WL 4374452, at *3 (Fla. 3d DCA Sept. 21, 2011) (rejecting a claim that condominium association’s board breached its fiduciary duty by failing to use its “best efforts” to obtain insurance for marina and boat slips, as no evidence suggested that such coverage “was available for purchase in the marketplace” at the relevant time).
We appreciate that section 718.111(ll)(b) does say that “every hazard insurance policy issued or renewed on or after January 1, 2004 ... shall provide coverage” for the specified items, and that insurers — not condominium associations— issue or renew insurance policies. We also *853 are cognizant of the fact that the legislature can — and does — regulate the business of insurance, and that unambiguous statutes enacted as part of its regulatory authority are “not subject to judicial construction, however wise it may seem to alter the plain language.” State v. Jett, 626 So.2d 691, 693 (Fla.1993). The path of least resistance would be to simply hold that the statute means what it says, and says what it means. If an insurance carrier wants to issue a condominium policy in this State, it must provide all the specified coverage, end of story. We are convinced, however, that such a literal reading of one isolated sentence in section 718.111(ll)(b) does not reflect the intent of the statute when consideration is given to “the language used, the subject matter, the purpose designed to be accomplished, and all other relevant and proper matters.” Badaraco, 676 So.2d at 503.
We therefore hold that when considered as a cohesive whole, section 718.111(11), Florida Statutes (2005), is intended to regulate the insurance obligation of condominium associations by: (a) specifying the items that the association is responsible for covering versus the items that the unit owners are responsible for covering; and (b) requiring associations to use their “best efforts” to obtain the coverage it is responsible for securing. The statute was not intended to impose a mandatory insurance obligation upon carriers. We therefore reverse the judgment below to the extent it awards damages for items excluded under Citizens’ policies.

Summary Judgment Was Improper Where the Trial Court Failed to Consider One of Citizens’ Objections to Specified Line Item Awards

We next turn to the question of whether the trial court prematurely entered summary judgment without considering Citizens’ objections to certain line item awards. As indicated previously, Citizens refused to pay certain items from the appraisal award, claiming that they were: (a) indisputably not owed pursuant to an agreement of the parties; (b) duplicative of amounts included in other parts of the award; or (c) items that were the responsibility of the unit owners to insure.
As to the first category of the disputed claims, Citizens maintains that prior to the appraisal the parties agreed on the amount owed for roof damage and water extraction loss -to Buildings A and C. As for duplication claims, Citizens asserts that certain losses were awarded twice — an example being an amount for replacing the duct-work in an entire building, and another line item amount for replacing the same ductwork in units within the building. Finally, Citizens claims that it properly removed from the award items that the unit owners were responsible for insuring, examples being amounts allocated to interior improvements such as baseboards, marble sills, and light fixtures.
Because appraisal clauses, such as the one agreed upon here, provide a mechanism for the “prompt resolution of claims and discourage the filing of needless lawsuits,” Fla. Ins. Guar. Ass’n, Inc., 34 So.3d at 794, they are now commonplace in casualty insurance policies, and favored by courts. Appraisers, however, are charged with the limited task of ascertaining. the amount (i.e., dollar value) of loss to the insured’s property. See State Farm Fire & Cas. Co. v. Licea, 685 So.2d 1285, 1288 (Fla.1996) (“We interpret the appraisal clause to require an assessment of the amount of a loss.”). Then, “ ‘[i]f after such ascertainment of the amount of the loss, it should be found that the insurers were legally liable for such loss, they at once [become] bound for the “amount” ascertained by such arbitrators.’ ” Id. at 1287 *854 (citing Am. Reliance Ins. Co. v. Vill. Homes at Country Walk, 632 So.2d 106, 109 (Fla. 3d DCA 1994) (Cope, J. dissenting)).
The division of responsibility between the appraisers and court is therefore clear. The appraisers determine the amount of the loss, which includes calculating the cost of repair or replacement of property damaged, and ascertaining how much of the damage was caused by a covered peril as opposed to things such as “ ‘normal wear and tear, dry rot, or various other designated, excluded causes.’” Johnson v. Nationwide Mut. Ins. Co., 828 So.2d 1021, 1025 (Fla.2002) (quoting Licea, 685 So.2d at 1288). The court decides whether the policy provides coverage for the peril which inflicted the damage, and for the particular property at issue; in other words, all coverage matters. See Florida Ins. Guar. Ass’n, Inc., 34 So.3d at 794 (“Issues relating to coverage challenges are questions exclusively for the judiciary.”).[4] See also Citizens Prop. Ins. Corp. v. Mango Hill Condo. Ass’n 12 Inc., 54 So.3d 578, 580 (Fla. 3d DCA 2011) (“A challenge to coverage is, as the Florida Supreme Court has confirmed, a matter for determination by a court; whereas, a challenge to the amount of a covered loss is for determination by an appraisal panel.”).
Applying this precedent to the particular defenses asserted by Citizens, we first address the contention that the parties reached a pre-appraisal agreement that settled the amount due for roof repairs and extraction for Buildings A and C, an amount Citizens allegedly paid based on this agreement. This defense does not raise a coverage issue, nor does it challenge the “amount of the loss” determined by the appraisers. It therefore does not clearly fall on either side of the jurisdictional dividing line. We hold that such a defense, in the nature of an accord and satisfaction, is one that should have been entertained by the court, as it raises a claim not encompassed by the appraisal clauses in the policies, as well as one that appraisers are ill equipped to decide. Although this claim is not in the nature of a “coverage” issue, it is a legal defense not directed at the amount of the loss. The trial court was therefore obligated to adjudicate it.
As for Citizens’ second defense— claiming that certain items awarded are duplicative—we hold that the trial court properly declined to address the matter. If the appraisers improperly duplicated itemized losses, it was incumbent upon Citizens to seek clarification and/or modification of the award. It was not the trial court’s duty to ascertain whether the amounts awarded were in fact duplica-tive—a task which could require the Court to engage in a factual inquiry in order to determine whether the assessed amounts in fact represent cost estimates to perform the “same” work. An alleged mistake of that nature raises an issue directly related to the “amount of loss” sustained to the particular property—an issue solely within the province of the appraisers.[5]
*855 Finally, we reject Citizens’ claim that it properly removed amounts from the appraisal award that represent loss to property the unit owners — as opposed to the River Manor — were responsible for insuring pursuant to section 718.111(11), Florida Statutes. We do so because there is much to glean from what Citizens does not argue — namely, that its policies do not provide coverage for these items. Rather, Citizens posits an irrelevant point as it does not matter whether River Manor was statutorily “obligated” to secure coverage for these items. The dispositive issue is whether the policies issued by Citizens actually cover them. Because Citizens does not contend that coverage is lacking the trial court did not err in refusing to entertain this argument, as the statutory division of responsibility urged by Citizens, even if correct, would provide no legal basis for reducing the award.[6]

Conclusion

For the reasons discussed above, we reverse the trial court’s final judgment and remand this cause with directions that the trial court enter a revised final judgment for the amounts set forth in the appraisal award less:
(i) amounts previously paid;
(ii) amounts allocated to exterior common elements excluded by the terms of the applicable insurance policies; and
(iii) amounts awarded in excess of any amount agreed upon by the parties for roof repairs and water extraction for Buildings A and C if, and only if, the trial court concludes — after an evidentia-ry hearing — that the parties reached a binding pre-appraisal agreement stipulating to the amount owed.
To the extent the trial court refused to adjudicate Citizens’ claims that amounts awarded were duplicative or represent losses to property the unit owners — as opposed to River Manor — were obligated to insure, the judgment is affirmed.

Affirmed in part, reversed in part and remanded with instructions.

GROSS and DAMOORGIAN, JJ„ concur.

. We note that section 627.418(1), Florida Statutes (2005), codifies the principle that insurance policies that are inconsistent with any statute within the Insurance Code must "be construed and applied in accordance with such conditions and provisions as would have applied had such policy ... been in full compliance with the code.” See also Auto-Owners Ins. Co. v. DeJohn, 640 So.2d 158, 161 (Fla. 5th DCA 1994) ("When an insurance policy does not conform to the requirements of statutory law, a court must write a provision into the policy to comply with the law, or construe the policy as providing the coverage required by law.”). In Sawyer v. Transamerica Life Ins. Co., 09-cv-61288, 2010 WL 1372447 (S.D.Fla. March 31, 2010), the court found that section 627.418 did not require that insurance policies conform to statutes "outside of the Insurance Code.” Id. at *6-7. Citizens’ policies, however, also require conformance with the "statutes of the State” *849 where the property is located. As Citizens does not assert that the conformance clauses in its policies should be interpreted as requiring amendments only when the policy "con-diets” with statutes within the Insurance Code, we proceed on the assumption that the policies must be amended to conform with any conflicting statute, regardless of its locale.

. Section 627.4135, Florida Statutes (2005), requires that all contents of casualty insurance covering property in this State "shall be subject to the applicable provisions of this part [i.e., Chapter 627] and to the other applicable provisions of this code.” The "Code” refers to the Florida Insurance Code. The 2005 version comprised Chapters 624-632, 634-636, 641-642, 648, 650, and 651 of the Florida Statutes.

. Of course in many cases these private parties will negotiate a mutually acceptable contract that includes all the coverage required by the statute. But they do not need legislative assistance to accomplish a transaction each believes to be in their best interest. The market itself will dictate that outcome. The only thing a literal interpretation of the statute does then is either prevent a carrier from issuing a policy altogether, or mandate a policy one or both of the parties may not want.

. We also have held that an insurer is entitled to raise coverage issues as to the elements of the claim even if it does not challenge coverage for all losses. Florida Ins. Guar. Ass’n, Inc. v. Olympus Ass’n, Inc., 34 So.3d 791 (Fla. 4th DCA 2010). See also Liberty Am. Ins. Co. v. Kennedy, 890 So.2d 539, 541 (Fla. 2d DCA 2005) ("A coverage issue may exist, of course, even where the insurer has not denied the claim as a whole. The issue of coverage is not necessarily a matter of all or nothing.").

. For example, Citizens claims that the appraisers awarded an amount to replace the ductwork in Building A—($26,124.00)—and then awarded amounts for replacing the same ductwork in the units within the building. *855 Unless the award, on its face, acknowledged this duplication, the trial court would have to take testimony to establish that: (a) the amounts allocated were in fact for the same ductwork; and (b) they are in fact duplicative, as opposed to the appraisers simply allocating the total cost between the building and interi- or units. These are issues that clearly could have — and should have — -been presented to the appraisers via a motion to clarify and/or amend the award.

. We assume Citizens advanced this particular argument in the alternative to its claim that its policies — and not § 718.111(11)- — dictate the terms of coverage, and that it was not attempting to have it both ways.