IN THE DISTRICT COURT OF APPEAL
FIRST DISTRICT, STATE OF FLORIDA

JOANNE McCALL, SENATOR
GERALDINE THOMPSON,
RABBI MERRILL SHAPIRO,
REV. HARRY PARROTT, JR.,
REV. DR. HAROLD BROCUS,
FLORIDA EDUCATION
ASSOCIATION, FLORIDA
CONGRESS OF PARENTS AND
TEACHERS, INC., LEAGUE OF
WOMEN VOTERS OF
FLORIDA, INC., AND
FLORIDA STATE
CONFERENCE OF BRANCHES
OF NAACP.

NOT FINAL UNTIL TIME EXPIRES TO
FILE MOTION FOR REHEARING AND
DISPOSITION THEREOF IF FILED

CASE NO. 1D15-2752

Appellants,

v.

RICK SCOTT, GOVERNOR OF
FLORIDA, IN HIS OFFICIAL
CAPACITY AS HEAD OF THE
FLORIDA DEPARTMENT OF
REVENUE, ET AL. AND
UMENE PROPHETE ET AL.,

Appellees.

_____/

Opinion filed August 16, 2016.

An appeal from the Circuit Court for Leon County.
George S. Reynolds, III, Judge.

Ronald G. Meyer, Jennifer S. Blohm, and Lynn C. Hearn of Meyer, Brooks, Demma and Blohm, P.A., Tallahassee; Pamela L. Cooper and William A. Spillias of Florida Education Association, Tallahassee; John M. West of Bredhoff & Kaiser, P.L.L.C., Washington, D.C.; Alice O'Brien of National Education Association, Washington, D.C.; David Strom of American Federal of Teachers, Washington, D.C., and Alex J. Luchenitser of Americans United for Separation of Church and State, Washington, D.C., for Appellants.

Pamela Jo Bondi, Attorney General, and Rachel Nordby, Deputy Solicitor General, Tallahassee, for Appellees Rick Scott, Pam Bondi, Jeff Atwater, Adam Putnam, Pam Stewart, and the Department of Revenue and Education.

Karen D. Walker and Nathan A. Adams IV of Holland & Knight LLP, Tallahassee; Daniel J. Woodring of Woodring Law Firm, Tallahassee; Howard Coker of Coker, Schickel, Sorenson, Posgay, Camerlengo & Iracki, Jacksonville; Jay P. Lefkowitz and Steven J. Menashi of Kirkland & Ellis LLP, New York, NY; Raoul G. Cantero of White & Case LLP, Miami, for Intervenor Appellees.

Michael Ufferman of Michael Ufferman Law Firm, P.A., Tallahassee, for Amicus Curiae Black Alliance For Educational Options;

ROWE, J.

The Florida Education Association, the Florida Congress of Parents and Teachers, Inc., the League of Women Voters of Florida, Inc., the Florida State Conference of Branches of the NAACP, a group of parents of children in public schools, teachers employed by public schools, and religious and community leaders

2

(collectively, Appellants) argue that the Florida Tax Credit Scholarship Program (FTCSP) is unconstitutional. They filed suit, seeking a declaration that the FTCSP violates the Florida Constitution by diverting public funds from Florida's public schools to religiously affiliated schools and by using taxpayer funds to create a parallel and non-uniform system of schools. Governor Rick Scott, Attorney General Pam Bondi, Chief Financial Officer Jeff Atwater, Commissioner of Agriculture Adam Putnam, Commissioner of Education Pam Stewart, the Florida Department of Revenue, and the Florida Department of Education (collectively, the State) moved to dismiss the suit on grounds that Appellants lacked standing to challenge the FTCSP. Appellants claim that they have standing, pursuant to Rickman v. Whitehurst, 74 So. 205 (Fla. 1917), based on their allegation of special injury, and also as taxpayers under the limited exception to the special injury rule expressed in Department of Administration v. Horne, 269 So. 2d 659 (Fla. 1972). Rejecting both arguments for standing advanced by Appellants, the trial court dismissed their complaint with prejudice. For the reasons that follow, we affirm.

## I. Background

Beginning in 1999, the Florida Legislature passed several laws to "[e]xpand educational opportunities for children of families that have limited financial resources." Ch. 2001-225, § 5, Laws of Fla. The Legislature expressed its intent to ensure "that all parents, regardless of means, may exercise and enjoy their basic right

3

to educate their children as they see fit . . . ."  § 1002.395(1)(a)3., Fla. Stat. (2014).

Among the education reforms adopted by the Legislature were two programs authorizing scholarships for children in failing public schools and children in low-income households: (1) the Florida Opportunity Scholarship Program and (2) the Florida Tax Credit Scholarship Program.

### A. *The Florida Opportunity Scholarship Program*

In 1999, the Florida Legislature established the Florida Opportunity Scholarship Program (OSP) to give students attending "failing" public schools the choice to attend better-performing schools.  Ch. 99-398, § 2, Laws of Fla.  The Legislature declared that:

> a student should not be compelled, against the wishes of the student's parent or guardian, to remain in a school found by the state to be failing for 2 years in a 4-year period.  The Legislature shall make available opportunity scholarships in order to give parents and guardians the opportunity for their children to attend a public school that is performing satisfactorily or to attend an eligible private school when the parent or guardian chooses to apply the equivalent of the public education funds generated by his or her child to the cost of tuition in the eligible private school . . . .

§ 229.0537(1), Fla. Stat. (1999) (repealed 2002).   The Legislature directly appropriated funds to the Department of Education for the OSP.   The Department of Education transferred those funds to the private school chosen by a qualified student's parent or guardian via a state warrant. § 229.0537(6)(b), Fla. Stat. (1999) (repealed).

4

Four years after the OSP was established, this Court held the OSP unconstitutional on grounds that it violated the no-aid provision of the anti-establishment clause in Florida's Constitution because state revenues were used to pay the cost of tuition at religiously affiliated schools. Bush v. Holmes, 886 So. 2d 340 (Fla. 1st DCA 2004) (en banc) (Holmes I). Two years later, the supreme court held that the OSP was an unconstitutional violation of the mandate in article IX, section 1 because it "foster[ed] plural, nonuniform systems of education in direct violation of the constitutional mandate for a uniform system of free public schools." Bush v. Holmes, 919 So. 2d 392, 398 (Fla. 2006) (Holmes II).

*B. The Florida Tax Credit Scholarship Program*

In 2001, the Legislature established the FTCSP. Ch. 2001-255, § 5, Laws of Fla. Designed to further expand school choice opportunities beyond those available under the OSP, scholarships offered under the FTCSP are not limited to students attending "failing" schools. Rather, students receiving certain government assistance or students whose families have an annual income below 185% of the federal poverty level are eligible to receive scholarships. § 1002.395(3)(c), Fla. Stat. (2015).

The FTCSP operates as follows. Individual and corporate taxpayers make voluntary contributions to Scholarship Funding Organizations (SFOs), including state universities, independent colleges and universities, and nonprofit

5

organizations. After making a contribution to an SFO, the taxpayer may seek a credit against their liability for the following taxes: (1) oil, gas, and mineral severance tax, (2) alcoholic beverage tax, (3) corporate income tax, (4) insurance premium tax, and (5) self-accrued direct-pay sales tax. § 1002.395(5)(b), Fla. Stat. (2015). Parents and guardians apply to SFOs to secure a scholarship for their student at a school of their choice. Scholarships may be used to pay tuition and fees at an eligible private school or to pay for transportation to a Florida public school that is outside of the student's district or to a lab school. § 1002.395(6)(d), Fla. Stat. (2015). An eligible private school may be religiously affiliated. § 1002.395(8), Fla. Stat. (2015). SFOs pay the scholarship funds directly to the participating private schools. § 1002.395(7)(f), Fla. Stat. (2015). For the 2014-2015 school year, 69,950 children from low-income families applied for and received scholarships under the FTCSP. See Fla. Dep't of Educ., Florida Tax Credit Scholarship Program Fact Sheet 1 (November 2015),

http://www.fldoe.org/core/fileparse.php/5606/urlt/FTC_Nov_2015.pdf.

## II. Procedural History

Thirteen years after the FTCSP was created, Appellants filed their lawsuit. They alleged that the FTCSP violates two provisions of the Florida Constitution: article I, section 3 and article IX, section 1(a). Appellants assert that the FTCSP violates the no-aid provision of article I, section 3, by diverting funds from the public

6

treasury and channeling those funds to religiously affiliated schools. Appellants claim that the FTCSP violates the mandate for the provision of a system of free and uniform public schools pursuant to article IX, section 1(a) by redirecting taxpayer funds from public schools to provide private-school scholarships and by creating a non-uniform system of public education.

The State argued that Appellants lack standing to bring suit because (1) Appellants did not allege any special injury, (2) Appellants failed to identify any legislative appropriation subject to a constitutional limitation on the Legislature's spending authority, and (3) Appellants' claims are not based on any constitutional provision limiting the Legislature's taxing authority. A group of parents whose children receive tax credit scholarships intervened in the action and moved to dismiss the complaint, echoing the State's arguments concerning Appellants' lack of special injury and taxpayer standing.

At the hearing on the motion to dismiss, the trial court determined that Appellants' allegations of harm were insufficient to establish standing. The court provided Appellants with an opportunity to amend their complaint to include additional factual allegations to support their claim of harm. But Appellants refused this offer. Appellants' counsel maintained at the hearing:

> Judge, we don't think we need to amend in any way at all. We think what we have said here in the second sentence of paragraph 19 is fully sufficient to allege that some of the . . . [Appellants] who have children in the public schools, . . . [or] who are teachers and administrators in

7

the public schools have been directly injured because of the loss of funding caused directly by the scholarship program.

The trial court concluded that Appellants failed to allege special injury standing because "whether any diminution of public school resources resulting from the [FTCSP] will actually take place is speculative, as is any claim that any such diminution would result in reduced per-pupil spending or in any adverse impact on the quality of education." The trial court added that it was not bound to "defer to a speculative and conclusory allegation, such as pleaded here, that some Plaintiffs have been 'injured' by the [FTCSP]." Finally, the trial court determined that Appellants lacked taxpayer standing because their claims were not directed at any exercise of the Legislature's spending authority. Appellants now appeal that order.

### III. Analysis

The sole issue before this Court is whether Appellants have standing to challenge the FTCSP. Standing is a question of law, which we review de novo. Pub. Def., Eleventh Jud. Cir. of Fla. v. State, 115 So. 3d 261, 282 (Fla. 2013).

In order to have standing to challenge a governmental action, a citizen taxpayer must show that he or she suffered or will suffer a special injury, distinct from other members of the community at large. Council for Secular Humanism, Inc. v. McNeil, 44 So. 3d 112, 121 (Fla. 1st DCA 2010); see also Miller v. Publicker Indus., Inc., 457 So. 2d 1374, 1375 (Fla. 1984) ("A party may challenge the constitutionality of a statute after showing that enforcement of the statute will

8

injuriously affect the plaintiff's personal or property rights."). An exception to the special injury requirement has been recognized for challenges to governmental action on constitutional grounds based directly on the Legislature's taxing and spending powers. Horne, 269 So. 2d at 663; Alachua Cty. v. Scharps, 855 So. 2d 195, 198 (Fla. 1st DCA 2003). Thus, we consider whether Appellants have alleged any special injury or whether the Legislature's authorization of the FTCSP violates specific constitutional limitations on the Legislature's taxing and spending power.

*A. Requirements for Special Injury Standing*

"[A] private citizen is precluded from filing a taxpayer complaint to challenge government action unless the private citizen alleges and proves a 'special injury,' which is an injury that is different from that of the general public." Smith v. City of Fort Myers, 944 So. 2d 1092, 1094 (Fla. 2d DCA 2006). The special injury rule was first explained by the supreme court in Rickman, 74 So. at 206. There, taxpayers challenged the county commissioners' decision to spend bond proceeds on the construction of roads and bridges. Id. at 206. In holding that the taxpayers in that case were required to allege that they suffered a special injury distinct from other members of the public, the court explained:

> We have . . . found no case in which such a suit has been maintained where it did not appear that special injury would result to the complainant as a taxpayer in the increased public burden as the result of the unauthorized act. The principle is universally recognized that to entitle a party to relief in equity he must bring his case under some acknowledged head of equity jurisdiction. In a case where a public

9

official is about to commit an unlawful act, the public by its authorized public officers must institute the proceeding to prevent the wrongful act, unless a private person is threatened with or suffers some public or special damage to his individual interests, distinct from that of every other inhabitant, in which case he may maintain his bill.

Id. at 207. The rationale for the special injury rule is grounded in the doctrine of separation of powers and requires courts to accord proper deference to legislative actions rather than opening the courthouse doors to disgruntled taxpayers who are not pleased with the taxing and spending decisions of their elected representatives. Paul v. Blake, 376 So. 2d 256, 259 (Fla. 3d DCA 1979) ("[I]t has long been recognized that in a representative democracy the public's representatives in government should ordinarily be relied on to institute the appropriate legal proceedings to prevent the unlawful exercise of the state or county's taxing and spending power."); see also DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 344-45 (2006) ("A taxpayer plaintiff has no right to insist that the government dispose of any increased revenue it might experience as a result of his suit by decreasing his tax liability or bolstering programs that benefit him. To the contrary, the decision of how to allocate any such savings is the very epitome of a policy judgment committed to the broad and legitimate discretion of lawmakers, which the courts cannot presume either to control or to predict." (internal quotations omitted)).

Since adopting the Rickman rule almost one hundred years ago, the supreme court has rejected invitations to eliminate the requirement of special injury for

10

taxpayer lawsuits. See, e.g., Fornes, 476 So. 2d at 156 (finding no reason to modify the special injury requirement for taxpayer suits); Dep't of Revenue v. Markham, 396 So. 2d 1120, 1121 (Fla. 1981) (reiterating that in the absence of a constitutional challenge a taxpayer must show a special injury distinct from that suffered by other taxpayers to have standing); U.S. Steele Corp. v. Save Sand Key, Inc., 303 So. 2d 9, 13 (Fla. 1974) (stating that although it had created a limited exception to the Rickman rule in Horne "this Court did not intend to abrogate in any way the special injury rule").

### B. Appellants Failed to Allege that They Suffered Any Special Injury

Here, the trial court correctly determined that Appellants lacked special injury standing because they failed to allege that they suffered a harm distinct from that suffered by the general public. Indeed, Appellants failed to allege any concrete harm whatsoever. Although Appellants were given an opportunity to amend their complaint, they chose to rest their argument for standing on the following allegations in their complaint:

> As Florida citizens and taxpayers, and organizations whose members are Florida citizens and taxpayers, plaintiffs have been and will continue to be injured by the unconstitutional expenditure of public revenues under the Scholarship Program. In addition, many of the plaintiffs (and members of the plaintiff organizations) whose children attend public schools, or who are teachers or administrators in the public schools, have been and will continue to be injured by the Scholarship Program's diversion of resources from the public schools.

Thus, Appellants' entire argument for special injury standing is that they have been

11

harmed by the FTCSP's alleged diversion of public revenues from public schools to private schools.

Appellants' diversion theory is incorrect as a matter of law. A close examination of the statutory provisions authorizing the FTCSP exposes the flaws in Appellants' argument. No funds under the FTCSP are appropriated from the state treasury or from the budget for Florida's public schools. See §§ 1002.395(2)(e), 1002.395(6)(d), Fla. Stat. (2015). Rather, all funds received by private schools under the FTCSP come from private, voluntary contributions to SFOs, after a parent or guardian has exercised their choice to enroll their child in a private school. § 1002.395(1)(b)1., Fla. Stat. (2015). Further, as will be discussed in further detail, tax credits received by taxpayers who have contributed to SFOs are not the equivalent of revenues remitted to the state treasury. § 1002.395(5)(b), Fla. Stat. (2015). Because there was no diversion of any state revenues from public schools to private schools through the operation of the FTCSP, Appellants' theory of harm and argument for special injury are insufficient to support standing.

Further, even assuming that Appellants' diversion theory was legally sufficient, Appellants' allegations that the FTCSP has harmed them are conclusory and speculative. Although it was bound to accept all material allegations within the complaint as true when evaluating Appellants' standing, Sun States Utilities, Inc. v. Destin Water Users, Inc., 696 So. 2d 944, 945 n.1 (Fla. 1st DCA 1997), the trial

12

court was not required "to accept internally inconsistent factual claims, conclusory allegations, unwarranted deductions, or mere legal conclusions made by a party," Shands Teaching Hospital and Clinics, Inc. v. Estate of Lawson ex rel. Lawson, 175 So. 3d 327, 331 (Fla. 1st DCA 2015) (en banc). Examining the allegations of injury claimed by Appellants, the trial court properly determined that they were conclusory and speculative. See Response Oncology, Inc. v. The Metrahealth Ins. Co., 978 F. Supp. 1052, 1058 (S.D. Fla. 1997) ("Courts must liberally construe and accept as true allegations of fact in the complaint and inferences reasonably deductible therefrom, but need not accept factual claims that are internally inconsistent; facts which run counter to facts of which the court can take judicial notice; conclusory allegations; unwarranted deductions; or mere legal conclusions asserted by a party.").

Appellants argue that but for the tax credits offered in exchange for contributions to SFOs, taxpayers would remit their full tax liability to the state, state revenues would increase, and the Legislature would appropriate those revenues to fund the public school system, in some manner that would benefit Appellants. This argument is founded entirely on supposition. To reach such a conclusion, the trial court would be required to anticipate whether the tax credit program positively or negatively stimulates economic growth, and thus affects state revenue collection.[1]

---

[1] "When a government expends resources or declines to impose a tax, its budget

Then, assuming tax revenues *decrease* as a result of the tax credits available under the FTCSP, the court would have to predict whether the tax revenue that would have been collected in the absence of the tax credit would have been allocated to the budget for the public school system. The trial court would have to forecast whether and how the Legislature would fund the education budget based on changes in public school enrollment. Finally, the court would have to foretell how fluctuations in the state's overall budget would affect the budget for the public school system. The cloudy crystal ball the trial court would be required to gaze into in order to identify a particularized harm to Appellants underscores the speculative nature of their arguments for standing.

The United States Supreme Court considered a similar theory of harm alleged by a group of taxpayers challenging Arizona's tax credit scholarship program. Winn, 563 U.S. at 126. The Arizona program operates very much like the FTSCP – offering tax credits in exchange for contributions to organizations that fund scholarships to students attending private schools. The Arizona taxpayers argued that the program was unconstitutional and advanced a similar theory of injury to the one asserted in this case – that the tax credit program unconstitutionally diverted

does not necessarily suffer. On the contrary, the purpose of many governmental expenditures and tax benefits is 'to spur economic activity, which in turn *increases* government revenues.'" Arizona Christian Sch. Tuition Org. v. Winn, 563 U.S. 125, 136 (2011) (quoting Cuno, 547 U.S. at 344)).

14

public funds from the Arizona public school system to private schools, resulting in harm to the plaintiffs.  Id. at 129-30.  The Supreme Court rejected the Arizona taxpayers' allegations that the scholarship program caused them harm:

> Even assuming the STO tax credit has an adverse effect on Arizona's annual budget, problems would remain.  To conclude there is a particular injury in fact would require speculation that Arizona lawmakers react to revenue shortfalls by increasing respondents' tax liability.  A finding of causation would depend on the additional determination that any tax increase would be traceable to the STO tax credits, as distinct from other governmental expenditures or other tax benefits.  Respondents have not established that an injunction against application of the STO tax credit would prompt Arizona legislators to "pass along the supposed increased revenue in the form of tax reductions."  Those matters, too, are conjectural.

> Each of the inferential steps to show causation and redressability depends on premises as to which there remains considerable doubt. The taxpayers have not shown that any interest they have in protecting the State Treasury would be advanced.  Even were they to show some closer link, that interest is still of a general character, not particular to certain persons.  Nor have the taxpayers shown that higher taxes will result from the tuition credit scheme. The rule against taxpayer standing, a rule designed both to avoid speculation and to insist on particular injury, applies to respondents' lawsuit.

Id. at 137-38 (internal citations omitted).  This same logic applies to Appellants' allegations of harm here.  Their alleged injury is simply too abstract to support standing.

Despite the speculative nature of the harm they allege, Appellants argue that two decisions of the Florida Supreme Court support their argument for standing.  Appellants first rely on the decision in Coalition for Adequacy and Fairness in

15

School Funding, Inc. v. Chiles, 680 So. 2d 400 (Fla. 1996). In Chiles, the supreme court held that public school students and their parents had standing to challenge the denial of an adequate education under article IX, section 1 of the Florida Constitution where the plaintiffs alleged concrete harm to particular students and to the school system. Id. at 403 n.4. The complaint in that case contained very specific allegations of harm, including that certain students were not receiving adequate special programs and that capital outlays were insufficiently funded. Thus, the Chiles case is readily distinguishable from this case, and it exposes the infirmities in Appellants' complaint.

Appellants also rely on the Florida Supreme Court's decision in Holmes II. Their reliance on this case is equally misplaced. There, the court held that the OSP undermined the quality of the public school system by appropriating state funds to private schools. Holmes II, 919 So. 2d at 405. Although the court did not address standing in that case, the court found the diversion of appropriated education funds from the public school system to private schools to be a tangible, concrete harm. Id. at 408. Appellants assert no such concrete harm or particularized injury in this case.

While the FTCSP has been fine-tuned since its creation in 2001, the essential function of the program – using voluntary private contributions to fund scholarships for eligible students – has remained unchanged. See Ch. 2001-225, Laws of Fla.; ch. 2016-140, Laws of Fla. Thus, there has been ample opportunity in the ensuing

16

fifteen years since the creation of the FTCSP for any decrease in funding to the public school system to manifest. And yet despite arguing that public funds have been diverted from the public school system, Appellants make no argument whatsoever that public school funding has actually declined. Because Appellants' allegations of harm are legally insufficient, entirely speculative, and express no particularized injury to Appellants, they lack standing to bring suit on grounds of special injury.

### C. The _Horne_ Exception to the Special Injury Rule

Alternatively, Appellants insist that they have standing to challenge the constitutionality of the FTCSP as taxpayers under the exception to the special injury rule adopted in Horne. In Horne, the Florida Supreme Court recognized a limited exception to the special injury rule in cases where a taxpayer challenges a legislative exercise of the taxing and spending power in contravention of specific constitutional provisions. 269 So. 2d at 663. Horne followed a United States Supreme Court case, Flast v. Cohen, 392 U.S. 83 (1968), which established a narrow exception for standing in federal taxpayer suits.

In Flast, a group of federal taxpayers challenged the appropriation of federal funds to "finance instruction in reading, arithmetic, and other subjects in religious schools, and to purchase textbooks and other instructional materials for use in such schools." 392 U.S. at 85-86. The taxpayers argued that Congress exceeded its

authority in appropriating funds in violation of the Establishment and Free Exercise Clauses of the First Amendment of the United States Constitution. Id. at 86. The Supreme Court determined that the taxpayers in that case had standing, explaining the narrow circumstances in which a taxpayer may challenge congressional action:

> [W]e hold that a taxpayer will have standing consistent with Article III to invoke federal judicial power when he alleges that congressional action under the taxing and spending clause is in derogation of those constitutional provisions which operate to restrict the exercise of the taxing and spending power. The taxpayer's allegation in such cases would be that his tax money is being extracted and spent in violation of specific constitutional protections against such abuses of legislative power. Such an injury is appropriate for judicial redress, and the taxpayer has established the necessary nexus between his status and the nature of the allegedly unconstitutional action to support his claim of standing to secure judicial review. Under such circumstances, we feel confident that the questions will be framed with the necessary specificity, that the issues will be contested with the necessary adverseness and that the litigation will be pursued with the necessary vigor to assure that the constitutional challenge will be made in a form traditionally thought to be capable of judicial resolution. We lack that confidence in cases such as Frothingham where a taxpayer seeks to employ a federal court as a forum in which to air his generalized grievances about the conduct of government or the allocation of power in the Federal System.

Id. at 105-06. Thus, the exception to the general rule against taxpayer standing established in Flast requires a taxpayer to allege more than just that a legislative act is unconstitutional. Id. at 102-03. Rather, a taxpayer must allege that a legislative act violates a specific constitutional limitation on the Legislature's taxing and spending power.

18

In Horne, the Florida Supreme Court similarly allowed a narrow exception to the special injury rule it established in Rickman and held that a taxpayer has standing to sue where the taxpayer can show that a government taxing measure or expenditure violates a specific constitutional limitation on the Legislature's taxing and spending power. Smith, 944 So. 2d at 1094; Scharps, 855 So. 2d at 198. Subsequently, Florida courts have found standing in a number of cases involving taxpayer challenges to constitutional limits on the Legislature's *spending* authority. See, e.g., Holmes II, 919 So. 2d at 406 (determining that article IX, section 1(a) was a restriction on the Legislature's spending power by "provid[ing] both a mandate to provide for children's education and a restriction on the execution of that mandate"); McNeil, 44 So. 3d at 122 (Fla. 1st DCA 2010) (holding that taxpayers had standing under the no-aid provision to challenge the constitutionality of statutes that authorized the state to direct appropriations to sectarian institutions). Courts have also found standing under the Horne exception where taxpayers identified a constitutional limit on the Legislature's *taxing* authority. See, e.g., Charlotte Cty. Bd. of City Comm'rs v. Taylor, 650 So. 2d 146, 148 (Fla. 2d DCA 1995) (determining that a taxpayer had standing to bring a constitutional challenge to a county tax exemption that was inconsistent with general laws which required county commissioners, not electors, to establish a budget and levy ad valorem taxes); Paul, 376 So. 2d at 257 (holding that a taxpayer had standing to challenge the county's authority to issue ad valorem

19

tax exemptions that violated specific limitations imposed by the Florida Constitution).

Thus, in order to establish standing under the <u>Horne</u> exception to the special injury rule, Appellants were required to identify both (1) a specific exercise of the Legislature's taxing and spending authority, and (2) a specific constitutional limitation upon the exercise of that authority. Appellants failed to establish taxpayer standing for two reasons. First, while both article I, section 3 and article IX, section 1(a) of Florida's Constitution either expressly or implicitly limit the Legislature's spending authority, Appellants failed to identify any portion of the FTCSP that exceeds the Legislature's spending authority under either constitutional provision. Second, neither provision limits the Legislature's taxing authority.

*D. Appellants Lack Taxpayer Standing Pursuant to article I, section 3*

Appellants allege that the Legislature exceeded both its taxing and spending authority in violation of article I, section 3 (Florida's so-called "Blaine Amendment"), which is also known as the no-aid provision.[2] Appellants assert that the no-aid provision limits the authority of the Legislature to grant tax credits and to

---

[2] Blaine Amendments, which prohibit the use of public funds to support religious schools, were widely enacted in response to political disputes over whether churches or sectarian organizations should receive public assistance. <u>Holmes I</u>, 886 So. 2d at 348-50. Approximately thirty states have "Blaine Amendments." Mark Edward DeForrest, <u>An Overview and Evaluation of State Blaine Amendments: Origins, Scope, and First Amendment Concerns</u>, 26 Harv. J.L. & Pub. Pol'y 551, 576 (2003).

authorize the funding of scholarships through voluntary contributions to SFOs under the FTCSP. We disagree. The plain language of the no-aid provision imposes no limitation on the Legislature's taxing authority. And although the no-aid provision expressly limits the Legislature's spending authority by prohibiting the appropriation of state revenues to aid any sectarian institution, Appellants identify no such appropriation connected with the FTCSP.

Any interpretation of a constitutional provision must begin with an examination of the provision's plain language. Brinkman v. Francois, 184 So. 3d 504, 510 (Fla. 2016). "If that language is clear, unambiguous, and addresses the matter in issue, then it must be enforced as written." Id. (quoting Fla. Soc'y of Ophthalmology v. Fla. Optometric Ass'n, 489 So. 2d 1118, 1119 (Fla. 1986)). Article I, section 3 of the Florida Constitution provides:

> There shall be no law respecting the establishment of religion or prohibiting or penalizing the free exercise thereof. Religious freedom shall not justify practices inconsistent with public morals, peace or safety. *No revenue of the state or any political subdivision or agency thereof shall ever be taken from the public treasury directly or indirectly in aid of any church, sect, or religious denomination or in aid of any sectarian institution.*

(emphasis added). The express language of Florida's no-aid provision contains no limit on the Legislature's taxing authority, including the Legislature's power to enact laws creating tax credits or exemptions; rather, this provision "focuses on the use of state funds to aid sectarian institutions, not other kinds of support." Holmes I, 886

21

So. 2d at 352.

Further, the plain language of the no-aid provision restricts only the Legislature's authority to appropriate state revenues from the public treasury. In construing this provision, our Court recognized that the grant of a tax exemption to a sectarian institution is not prohibited by the no-aid provision because it does not involve a disbursement from the public treasury. Id. at 356-57. Thus, in order for a taxpayer to have standing to challenge legislative action under the no aid provision, "the challenge must be to legislative appropriations." McNeil, 44 So. 3d at 121; see also Philip J. Padovano, Florida Civil Practice § 4.3 n.9 (2015-2016 ed.) ("The rule is often applied to challenges to appropriations acts, but it can also be used to challenge other kinds of statutes, provided they authorize the expenditure of public funds. But as the court explained in Flast, the expenditure must be for a specific purpose that is related to the alleged constitutional violation and not merely incidental to the regulatory scheme adopted by the statute."). But Appellants identify no legislative appropriation here.

Indeed, the legislative actions challenged in this case, the authorization of tax credits under the FTCSP and the payment of private funds to private schools via scholarships authorized under the FTCSP, involve no appropriation from the public treasury. The program is funded through voluntary, private donations by individual and corporate taxpayers. §§ 1002.395(1)(b)1.; 1002.395(2)(e), Fla. Stat. (2015).

22

Despite the lack of any appropriation by the Legislature in funding the FTCSP, Appellants urge this Court to hold that the use of tax credits to fund the program amounts to an indirect appropriation of revenue from the public treasury in violation of the no-aid provision. Appellants assert that any distinction between tax credits and revenues is constitutionally immaterial because the funds credited to taxpayers could have been collected and transferred to the state treasury. In advancing this novel construction of the no-aid provision, Appellants ignore the substantial difference between tax credits and state revenues. In Holmes I, we explained that, "[i]n the case of direct subsidy, the state forcibly diverts the income of both believers and nonbelievers to churches. In the case of an exemption, the state merely refrains from diverting to its own uses income independently generated by the churches through voluntary contributions." Id. (quoting Donald A. Giannella, Religious Liberty, Nonestablishment, and Doctrinal Development, 81 Harv. L. Rev. 513, 553 (1968)). In so holding, our Court relied on the following reasoning advanced by Justice Brennan:

> Tax exemptions and general subsidies, however, are qualitatively different [than the payment of state funds]. Though both provide economic assistance, they do so in fundamentally different ways. A subsidy involves the direct transfer of public monies to the subsidized enterprise and uses resources exacted from taxpayers as a whole. An exemption, on the other hand, involves no such transfer. It assists the exempted enterprise only passively, by relieving a privately funded venture of the burden of paying taxes. In other words, in the case of direct subsidy, the state forcibly diverts the income of both believers and nonbelievers to churches, while in the case of an exemption, the

23

> state merely refrains from diverting to its own uses income independently generated by the churches through voluntary contributions. Thus, the symbolism of tax exemption is significant as a manifestation that organized religion is not expected to support the state; by the same token the state is not expected to support the church.

Id. at 356-57 (quoting Walz v. Tax Comm'n of City of New York, 397 U.S. 664, 690-91 (1970) (Brennan, J., concurring)).

The United States Supreme Court made precisely the same distinction between revenues and tax credits (as opposed to tax exemptions) when it considered the constitutionality of the tax credits offered under the Arizona scholarship program in Winn. 563 U.S. at 141-42. The Supreme Court observed that the expenditure of state revenues on religiously affiliated activities made it known to a dissenter that her tax dollars were spent in violation of her conscience. Id. However, when the government declined to impose a tax, there was no connection between the dissenting taxpayer and a religiously affiliated activity. Id. at 142. The Supreme Court also rejected the argument that taxpayers who benefited from tax credits were in effect paying their state income tax to scholarship organizations. Id. at 143. "Respondents' contrary position assumes that income should be treated as if it were government property even if it has not come into the tax collector's hands. That premise finds no basis in standing jurisprudence." Id.; accord Kotterman v. Killian, 972 P.2d 606, 618 (Ariz. 1999) (en banc) ("[N]o money *ever* enters the state's control as a result of this tax credit. Nothing is deposited in the state treasury or

other accounts under the management or possession of governmental agencies or public officials. Thus, under any common understanding of the words, we are not here dealing with 'public money.'"); Manzara v. State, 343 S.W.3d 656, 664 (Mo. 2011) (en banc) (finding no taxpayer standing because "tax credits are not government expenditures"). Tax credits offered under the FTCSP involve no public funds. And Appellants failed to identify any portion of the FTCSP authorizing legislative appropriations or any other exercise of the Legislature's spending authority. See Winn, 563 U.S. at 142 (holding that when taxpayers choose to contribute to scholarship organizations, they are expending their own funds, not revenue collected by the state). For this reason, we affirm the trial court's ruling that Appellants failed to demonstrate taxpayer standing under article I, section 3.

*E. Appellants Lack Taxpayer Standing Pursuant to article IX, section 1(a)*

Appellants also argue that in authorizing the FTCSP, the Legislature exceeded its taxing and spending authority under article IX, section 1(a) of the Florida Constitution. Appellants' argument is set forth in the following two paragraphs of their complaint:

> 60. Like the OSP, the Scholarship Program is unconstitutional because through it the State has established a governmental program providing for private-school vouchers, funded by redirecting taxpayer funds, that educates Florida children in a manner other than through the system of free public schools mandated by Article IX, § 1.

> 61. In addition, the Scholarship Program is – as was the case with the OSP – unconstitutional because it funds the education of Florida

25

children in a system of schools that is not "uniform," as required by Article IX, § 1.

These allegations fail to show that the Legislature exceeded any limit on its taxing and spending authority.

In order to establish standing under <u>Horne</u>, Appellants were required not only to identify a specific exercise of the Legislature's taxing and spending authority, but also a specific constitutional limitation on that authority. Article IX, section 1(a) provides:

> The education of children is a fundamental value of the people of the State of Florida. It is, therefore, a paramount duty of the state to make adequate provision for the education of all children residing within its borders. Adequate provision shall be made by law for a uniform, efficient, safe, secure, and high quality system of free public schools that allows students to obtain a high quality education and for the establishment, maintenance, and operation of institutions of higher learning and other public education programs that the needs of the people may require.

The plain language of article IX, section 1(a) does not contain any express or implied limitation on the Legislature's *taxing* authority. <u>But see</u>, art. VII, § 3(c)-(d), Fla. Const. (imposing restrictions on the authority of counties and municipalities to levy certain taxes); art. VII, § 9, Fla. Const. (imposing restrictions on certain entities' abilities to levy ad valorem taxes); art. VIII, §1(h), Fla. Const. (imposing a limit on the authority of municipalities to impose a tax on property for services rendered by the county exclusively for the benefit of the property or residents in unincorporated areas). Because article IX, section 1(a) does not limit the Legislature's taxing power,

26

Appellants may only raise a constitutional challenge under that provision by showing that the Legislature exceeded its *spending* authority.

On two occasions, the Florida Supreme Court has recognized that article IX, section 1(a) limits the Legislature's spending authority. In Chiles, the supreme court construed this provision to require the Legislature to appropriate sufficient public revenue to adequately fund Florida's public school system. 680 So. 2d at 405-06. In Holmes II, the supreme court construed this provision to restrict the Legislature's authority to use public revenues to fund private schools. 919 So. 2d at 408. Although neither decision discussed standing in any significant detail, the court's holdings in those cases expose the flaws in Appellants' arguments for standing here.

First, in Chiles, the plaintiffs alleged that the Legislature violated article IX, section 1 by failing to allocate adequate resources to public schools. 680 So. 2d at 402. There, the plaintiffs alleged:

> (1) Certain students are not receiving adequate programs to permit them to gain proficiency in the English language; (2) Economically deprived students are not receiving adequate education for their greater educational needs; (3) Gifted, disabled, and mentally handicapped children are not receiving adequate special programs; (4) Students in property-poor counties are not receiving an adequate education; (5) Education capital outlay needs are not adequately provided for; and (6) School districts are unable to perform their constitutional duties because of the legislative imposition of noneducational and quasi-educational burdens.

Id. These allegations by the Chiles plaintiffs enumerated a number of specific harms to the public school system, including inadequate special programs for specific

27

groups of students and insufficient funding of capital outlays. Here, unlike the Chiles plaintiffs, Appellants do not allege that the Legislature failed to adequately fund Florida's public school system. They do not allege that the authorization of the FTCSP resulted in the deprivation of access to special programs, the inability to meet capital outlay needs, nor any other specific harm held by the Chiles court to violate article IX, section 1(a). Thus, a comparison to Chiles reveals the deficiencies in Appellants' complaint.

Second, in Holmes II, the supreme court held that "[article IX, section 1(a)] mandates that the state's obligation is to provide for the education of Florida's children, specifies that the manner of fulfilling this obligation is by providing a uniform, high quality system of free public education, and does not authorize equivalent alternatives." Holmes II, 919 So. 2d at 408. In holding the OSP unconstitutional, the supreme court identified a number of ways the Legislature violated article IX, section 1(a) by exceeding its spending authority. Id. The court concluded that the Legislature authorized some students "to receive a publicly funded education through an alternative system of private schools that [were] not subject to the uniformity requirements of the public school system," id. at 412, "divert[ed] public dollars into separate private systems," id. at 398, and "transfer[red] tax money earmarked for public education to private schools" id. at 408. The court focused on the Legislature's appropriation of public funds:

28

> Our decision does not deny parents recourse to either public or private school alternatives to a failing school. Only when the private school option depends upon public funding is choice limited. This limit is necessitated by the constitutional mandate in article IX, section 1(a), which sets out the state's responsibilities in a manner that does not allow the use of state monies to fund a private school education.

Id. at 412-13. Thus, the supreme court's analysis of whether the Legislature exceeded its spending authority under article IX, section 1(a) was limited to determining if the Legislature appropriated public funds for use in private schools.

Here, Appellants failed to allege that the Legislature appropriated any public funds to private schools. Appellants failed to allege any inadequacy in the funding of the state's system of education. Because of these failures, Appellants have insufficiently alleged that the Legislature exceeded its spending authority under article IX, section 1(a). Accordingly, we affirm the trial court's finding that Appellants failed to establish taxpayer standing under this provision.

### IV. Conclusion

Appellants failed to allege that they suffered any special injury as a result of the operation of the Florida Tax Credit Scholarship Program and failed to establish that the Legislature exceeded any constitutional limitation on its taxing and spending authority when it authorized the program. At most, Appellants quarrel with the Legislature's policy judgments regarding school choice and funding of Florida's public schools. This is precisely the type of dispute into which the courts must decline to intervene under the separation of powers doctrine. Markham, 396 So. 2d

29

at 1122.  Appellants' remedy is at the polls.  Paul, 376 So. 2d at 259.

We conclude that the trial court properly found that Appellants lack standing to attack the constitutionality of the Florida Tax Credit Scholarship Program.  We thus AFFIRM the trial court's order dismissing the complaint.

MAKAR and BILBREY, JJ., CONCUR.